CUDAHY, Circuit Judge.
Sands, Taylor & Wood Company (STW) brought this action against The Quaker Oats Company (Quaker) for federal trademark infringement and related state-law claims, alleging that Quaker’s use of the words “Thirst Aid” in its advertising slogan “Gatorade is Thirst Aid” infringed STW’s registered trademark for THIRST-AID. The district court agreed, and entered judgment for STW.in the amount of $42,629,399.09, including prejudgment interest and attorney’s fees. The court also permanently enjoined Quaker from using the words “Thirst Aid.” Not surprisingly, Quaker appeals.
I.
Plaintiff STW is a small, Vermont-based company that for the past 180 years has sold bagged flour at retail under the brand name “King Arthur Flour.” In 1973, STW acquired Joseph Middleby, Jr., Inc. (Middle-by), a manufacturer of soft drinks, soda fountain syrups and ice cream toppings. STW thereby became the owner of three trademarks registered to Middleby: (1) THIRST-AID “First Aid for Your Thirst,” issued October 10, 1950, for use on “nonalcoholic maltless beverages, sold as soft drinks, and syrups therefor”; (2) THIRST-AID, issued August 26, 1952, for use on various ice cream toppings as well as “fruits and sauces used in the making of ice cream”; and (3) THIRST-AID, issued March 24, 1953, for use on “soda fountain syrups used in the preparation of maltless soft drinks.”
From 1921 to 1973, Middleby used the THIRST-AID mark on a wide variety of beverage products and syrups that it sold to soda fountains, ice cream parlors and food service outlets. Middleby also supplied its THIRST-AID customers with various items displaying the name THIRST-AID, including streamers, banners, glasses and pitchers, for in-store advertising and promotion. STW continued these activities *950 after it acquired Middleby, which it operated as a wholly-owned subsidiary.
In the late 1970s sales of THIRST-AID soft drinks declined as consumers turned increasingly to bottles and cans rather than soda fountains and ice cream parlors for their soft drinks. In addition, between 1979 and 1983 STW underwent a period of severe economic hardship during which its annual gross revenues dropped from $40 million to approximately $3.1 million. In the spring of 1980, Pet, Inc. (Pet) negotiated with STW a nationwide license to use the name THIRST-AID on a new isotonic beverage[1] intended to compete with the very popular Gatorade brand isotonic beverage manufactured by Stokely Van Camp Company (Stokely). Pet began test-marketing the product in twenty stores in Columbia, South Carolina in June of 1980. Pet’s THIRST-AID was advertised through the same media as Gatorade, and was sold through the same channels of trade (grocery stores) to the same customers. During the five-month period of the test, Pet’s THIRST-AID captured approximately 25% of the isotonic beverage market in the test area. Nevertheless, for reasons that are not important here, Pet decided not to enter the market with the new product and in June of 1981 its license to use the name THIRST-AID expired.
In December of 1981, STW sold the assets of Middleby (now renamed Johnson-Middleby) to L. Karp & Sons (Karp), a distributor of bakery products. As part of the sale, STW assigned to Karp all of the registered THIRST-AID trademarks. STW obtained a simultaneous exclusive license back for retail use of the trademark on certain “Products” defined as “jams, jellies, pie fillings” and various other bakery supplies.
In August of 1983, Stokely, the manufacturer of Gatorade, was acquired by Quaker. Shortly thereafter, Quaker solicited proposals for a new advertising campaign intended to educate consumers about Gatorade’s ability to quench thirst and replace fluids and minerals lost by the human body through strenuous exercise. One of the candidates was the slogan “Gatorade is Thirst Aid for That Deep Down Body Thirst.”
Pursuant to Quaker’s regular practice, the proposed “Thirst Aid” campaign was submitted to the legal department for approval in February or March of 1984. Quaker’s in-house counsel, Charles Lannin, concluded that the words “Thirst Aid” did not raise any trademark problems because they were used to describe an attribute of the product rather than as a designation of source or affiliation. Lannin therefore did not conduct a trademark search for the term “Thirst Aid” at this time.
Shortly thereafter, an employee of Quaker’s research and development division telephoned Lannin and informed him that Pet had previously test-marketed an isotonic beverage called THIRST-AID. Lannin contacted Pet and was told that Pet had discontinued its isotonic beverage a few years before. Some weeks later, another Quaker employee informed Lannin that he thought a “Thirst Aid” beverage was being marketed in Florida. At this point, on May 2, 1984, Lannin obtained a trademark search of the phrase “Thirst Aid.” The search revealed the three THIRST-AID registrations by Middleby as well as the sale of the marks to Karp. Lannin directed a trademark paralegal employed by Quaker to contact Karp in order to determine what products it was selling under the THIRST-AID name; the Karp employee to whom the paralegal spoke[2] stated that “they [sic] didn’t think they marketed anything under that name.” Tr. at 942.
On May 12, 1984, the first “Gatorade is Thirst Aid” commercials ran on television. On May 31, 1984, Karp’s lawyer, Russell *951 Hattis, called Quaker regarding Quaker’s use of “Thirst Aid.” Hattis claimed that Quaker was infringing Karp’s trademarks, to which Lannin responded that there was no infringement because Quaker was using the words “Thirst Aid” descriptively. In a subsequent meeting between the two, Lan-nin learned from Hattis that the THIRST-AID mark had not been used on soft drinks or beverages since the Pet test-market. On June 2, Quaker sought an opinion from outside trademark counsel, Robert New-bury, who essentially agreed with Lannin that there was no infringement because Quaker was using the words “Thirst Aid” descriptively rather than as a trademark.
On June 4, Lannin was contacted by Frank Sands, the president of STW, who stated that STW owned the rights to use the THIRST-AID mark at retail under a licenseback agreement with Karp. Sands claimed that Quaker was infringing those rights, although he acknowledged that STW did not sell any THIRST-AID products at that time.
Quaker did not hear from either Karp or STW again until the commencement of this litigation. In the interim, STW entered into a written agreement with Karp under which STW paid Karp $1 for an assignment of Karp’s trademark registrations. Sands filed suit one week later, alleging that the slogan “Gatorade is Thirst Aid for That Deep Down Body Thirst” infringed its registrations and constituted unfair competition under the Lanham Act, 15 U.S.C. §§ 1051 et seq., state common law and various state statutes. After granting summary judgment in favor of STW on Quaker’s fair use defense, the district court held a bench trial on the remaining issues. On December 18, 1990, the court issued its opinion holding that Quaker had infringed STW’s trademark and awarding STW 10% of Quaker’s pre-tax profits on Gatorade for the period during which Quaker used “Thirst Aid” in its advertising. Sands, Taylor & Wood v. The Quaker Oats Co., 18 U.S.P.Q.2d 1457, 1990 WL 251914 (N.D.Ill.1990). The court also awarded STW attorney’s fees and costs as well as prejudgment interest. Gatorade appeals.
II.
As we have noted, the district court granted summary judgment in favor of STW on Quaker’s defense that it had made a “fair use” of the phrase “Thirst Aid.”[3] The fair use doctrine is based on the principle that no one should be able to appropriate descriptive language through trademark registration. William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 528, 44 S.Ct. 615, 616, 68 L.Ed. 1161 (1924). To prevail on the fair use defense, the defendant must establish that its use of a registered “term or device” is “otherwise than as a trade or service mark,” that the term or device is “descriptive of” the defendant’s goods or services and that the defendant is using the term or device “fairly and in good faith only to describe to users” those goods and services. 15 U.S.C. § 1115(b)(4). The district court found that the term “Thirst Aid” was not descriptive of Gatorade but rather was “suggestive.” The court also found that even if “Thirst Aid” were descriptive, Quaker could not prevail on the fair use defense because it had used the term as a trademark in its ads. Quaker challenges both of these conclusions.[4]
We review a district court’s grant of summary judgment de novo, “viewing the record and all reasonable inferences drawn from it in the light most favorable to the party opposing the motion.” Anderson v. Stauffer Chemical Co., 965 F.2d 397, 400 (7th Cir.1992). We will affirm the grant of summary judgment only if we conclude from the pleadings and other materials that were before the district court “that there is no genuine issue as to any material fact and that the moving party is entitled to *952 judgment as a matter of law.” Fed. R.Civ.P. 56(c).
A. Descriptiveness of “Thirst Aid”
The district court’s classification of a term as “descriptive” or “suggestive” is a factual determination subject to review for clear error. Forum Corp. v. Forum, Ltd., 903 F.2d 434, 438 (7th Cir.1990); G. Heileman Brewing Co. v. AnheuserBusch, Inc., 873 F.2d 985, 992 (7th Cir. 1989); see also 1 J. Thomas McCarthy, Trademarks and Unfair Competition § 11:1, at 94 (1991 Supp.) (citing cases). In this case, however, the district court’s determination that “Thirst Aid” is suggestive rather than descriptive was made in the context of a summary judgment motion. Courts are not empowered to make factual findings on motions for summary judgment. The district court’s grant of summary judgment on this issue therefore amounts to a finding that, even resolving all factual disputes in favor of Quaker, the term “Thirst Aid” is not descriptive of Gatorade as a matter of law. We review this legal conclusion de novo.[5]
The district court described the difference between a suggestive mark and a descriptive one as follows: “ ‘[I]f the mark imparts information directly it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive.’ ” Mem. Op. at 5, 1985 WL 1567 (May 29, 1985) (quoting Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 379 (7th Cir.1976)). Purporting to apply this test, the district court found that “Thirst Aid” was suggestive rather than descriptive because it “requires imagination to create the impression of an isotonic beverage.” Id. at 9. Quaker argues that the district court erred in reaching this conclusion because it misapplied the relevant legal standard.
We agree. The district court thought that in order to be descriptive the term “Thirst Aid” had to bring to mind the product in question — “create the impression of an isotonic beverage.” Our cases, however, hold that “it is not necessary that a descriptive term depict the [product] itself, but only that the term refer to a characteristic of the [product].” Forum Corp., 903 F.2d at 444 (emphasis in original); see also Heileman, 873 F.2d at 992 (“ ‘A merely descriptive term specifically describes a characteristic or ingredient of the goods.’ ”) (emphasis added) (quoting Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 79 (7th Cir.1977)). Under that test, the district court’s conclusion that “Thirst Aid” is not, as a matter of law, descriptive of Gatorade cannot stand. In support of its opposition to STW’s motion for summary judgment, Quaker presented evidence that consumers understand the words “Thirst Aid” to convey the message that Gatorade helps quench thirst— that is, that “Thirst Aid” describes a characteristic of Gatorade.[6] See Defendant’s Motion for Summary Judgment on Fair Use, Ex. D, E & H, Aff. of Mark Shapiro and Excerpts from Dep. of Frank E. Sands. In Heileman, we observed that “the true *953 test [of descriptiveness] is one of consumer perception — how is [the term] perceived by the average prospective consumer?” 873 F.2d at 994 (emphasis added). Quaker’s evidence certainly created a material issue of fact as to whether the average consumer perceives “Thirst Aid” as describing a characteristic of Gatorade — its ability to quench thirst.
The fact that “Thirst Aid” is not a common phrase does not preclude a finding that it is descriptive rather than suggestive. That a term is an “unfamiliar” one which “requires a hearer to think about its meaning does not show that it is suggestive.” Forum Corp., 903 F.2d at 443. Nor does the fact that “Thirst Aid” is a play on words which makes one think of “first aid” as well as “thirst quenching” render it suggestive as a matter of law. See, e.g., 20th Century Wear, Inc. v. Sanmark-Stardust, Inc., 747 F.2d 81 (2d Cir.1984) (trademark “Cozy Warm — Energy Savers” for women’s pajamas found to be descriptive despite reference to energy crisis); Pizzazz Pizza & Restaurant v. Taco Bell Corp., 642 F.Supp. 88 (N.D.Ohio 1986) (word “pizzazz” to describe pizza found to be descriptive); Pullan v. Fulbright, 287 Ark. 21, 695 S.W.2d 830 (1985) (phrase “shear pleasure” as name for hair salon found to be descriptive). We have stated that “the imagination required to link a suggestive term with the corresponding product ‘refers to the mental process required to connect a name that is incongruous or figurative with the product (e.g., “Roach Motel” with an insect trap or “TIDE” with soap)...’” Heileman Brewing, 873 F.2d at 997 (quoting district court opinion, 676 F.Supp. 1436, 1491 n. 46 (E.D.Wis.1987)). The linkage of “thirst” and “aid” to form a play on both “first aid” and “lemonade” does not make the phrase “incongruous” or “figurative” in its method of description. “[N]o flight of imagination or keen logical insight is required,” id. at 993, to make the connection between “Thirst Aid” and a product that quenches thirst. This fact distinguishes “Thirst Aid” from other plays on words that courts have found to be suggestive rather than descriptive. For example, in Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694 (2d Cir.1961), the court found that the term “Poly Pitcher” was not descriptive of poly: ethylene pitchers because to the average consumer the word “poly” did not connote a product made of polyethylene. Thus, the only association evoked by the term “Poly Pitcher” was with the historical figure of Molly Pitcher, making the term an “incongruous expression” with “the characteristics of a coined or fanciful mark.” 294 F.2d at 700. We conclude that the district court erred in finding “Thirst Aid” suggestive as a matter of law.
B. Use of “Thirst Aid” as a Trademark
The district court also found that, even if “Thirst Aid” were descriptive, Quaker could not prevail on its fair use defense because it used the term as a trademark. A word or phrase functions as a trademark when it is “used by a source of [a product] to identify itself to the public as the source of its [product] and to create in the public consciousness an awareness of the uniqueness of the source and of its [products].” M.B.H. Enterprises, Inc. v. WOKY, Inc., 633 F.2d 50, 54 (7th Cir.1980). The court observed that " ‘Gatorade’ clearly identifies the product as being from a particular source.” Mem. Op. at 9. The court concluded, however, that “[w]hen defendant uses ‘Thirst Aid,’ ... it too identifies the product as being from a particular source.” Id. at 9-10. The court noted that “Thirst Aid” is “the most prominent feature of some of defendant’s advertising. Each of the ads includes the statement ‘Gatorade is THIRST AID.’” Id. at 10. The court therefore found that “[t]he way in which the defendant uses the words Thirst Aid creates an impression that the slogan is uniquely associated with Gatorade.” Id.
Quaker argues that its use of a descriptive mark in conjunction with its own clearly established trademark, “Gatorade,” could not be a trademark use. In support of this argument, Quaker relies in part on this court’s observation that descriptive terms are “unlikely” to function as trademarks. M.B.H. Enterprises, 633 F.2d at 54. We have never said, however, that a descriptive term can never function *954 as a trademark. Such a rule would not only conflate two of the three elements of fair use, it would also be contrary to the well-established doctrine that a descriptive term is protectable as a trademark to the extent it has developed secondary meaning. Heileman, 873 F.2d at 998; International Kennel Club, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1085 (7th Cir.1988); Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 79 (7th Cir.1977); see also Venetianaire Corp. v. A & P Import Co., 429 F.2d 1079 (2d Cir.1970) (defendant’s use of word “Hygienic” on mattresses infringed plaintiff’s rights in its mark “Hy-gient”).
Nor is a defendant’s use of a term in conjunction with its own trademark per se a use “other than as a trademark.” See, e.g., Lindy Pen Co. v. Bic Pen Corp., 725 F.2d 1240, 1248 (9th Cir.1984) (defendant’s use of descriptive word “Auditors” on its pen was a trademark use even though the word appeared in conjunction with defendant’s brand name on pens, packaging and promotional materials); Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 938 (10th Cir.1983) (no fair use where defendant used “Brew Nuts” as a “secondary trademark” along with its own brand name on packaging). Indeed, in the related context of determining likelihood of confusion,[7] some courts have observed that the conjunction of defendant’s trademark and the allegedly infringed term “may actually increase the misappropriation by linking defendant’s name to plaintiff’s goodwill.” Banff, Ltd. v. Federated Department Stores, Inc., 841 F.2d 486, 492 (2d Cir. 1988); see also Americana Trading Inc. v. Russ Berrie & Co., 966 F.2d 1284, 23 U.S.P.Q.2d 1031 (9th Cir.1992); cf. International Kennel Club, 846 F.2d at 1088 (argument that defendant’s use of its house mark in conjunction with plaintiff’s mark decreases likelihood of confusion is a “smokescreen and a poor excuse for the defendants’ blatant misappropriation of the plaintiff’s name”). Clearly, then, the fact that the Gatorade trademark always appears in Quaker’s “Thirst Aid” advertisements does not preclude a finding that those advertisements also use “Thirst Aid” as a trademark.
The evidence of Quaker’s advertisements supports the district court’s conclusion that Quaker used “Thirst Aid” as a trademark. Quaker’s ads do not simply use the words “Thirst Aid” in a sentence describing Gatorade, but as an “attention-getting symbol.” 1 McCarthy, supra § 11:17, at 476. In many of the ads, the words “Thirst Aid” appear more prominently and in larger type than does the word “Gatorade.” Id. at 476 n. 7 (collecting cases). Further, given the rhyming quality of “Gatorade” and “Thirst Aid,” the association between the two terms created by Quaker’s ads is likely to be very strong, so that “Thirst Aid” appears as part of a memorable slogan that is uniquely associated with Quaker’s product. See Louis Rich, Inc. v. Horace W. Longa-cre, Inc., 423 F.Supp. 1327 (E.D.Pa.1976) (use meant to foster identification with defendant and its product is not a fair use). Quaker presented no evidence that its “Thirst Aid” ads do not have this effect on consumers. “[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.” Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The district court did not err in concluding that Quaker used “Thirst Aid” as a trademark.
III.
Because trademark rights derive from the use of a mark in commerce and not from mere registration of the mark, the owner of a mark will lose his exclusive *955 rights if he fails actually to use it. 15 U.S.C. § 1127. A mark is deemed to be thus “abandoned” when “its use has been discontinued with intent not to resume such use.” Id. Two years of nonuse create a prima facie case of abandonment, which may be rebutted by “evidence explaining the nonuse or demonstrating the lack of an intent not to resume use.” Roulo v. Russ Berne & Co., 886 F.2d 931, 938 (7th Cir. 1989). Quaker argues that the district court erred in finding that STW or its predecessors had not abandoned through non-use the THIRST-AID mark for a beverage sold at retail. Alternatively, Quaker contends that Karp abandoned the THIRST-AID marks through its 1984 assignment of those marks to STW.
A. Nonuse
1. Middleby Abandoned the Mark
Quaker contends that STW has no registration rights covering the use of THIRST-AID on a beverage because the trademark THIRST-AID “First Aid for Your Thirst,” the only mark registered for use on “beverages” as opposed to “beverage syrups,” has not been used since 1949. We reject this argument for two reasons. First, the fact that STW and its predecessors have not used the entire slogan THIRST-AID “First Aid for Your Thirst” since 1949 does not necessarily mean that the registration has been abandoned. “[Mjinor changes in a mark which do not change the basic, overall commercial impression created on buyers will not constitute any abandonment.” 1 McCarthy, supra § 17:10, at 787. So long as the owner continues use of the “key element” of the registered mark, courts generally will not find abandonment. Id. Further, “the dropping of a non-essential word from a mark” has been held not to constitute abandonment. Id.; see, e.g., Puritan Sportswear Corp. v. Shure, 307 F.Supp. 377 (W.D.Pa.1969) (change from PURITAN SPORTSWEAR, THE CHOICE OF ALL AMERICANS to PURITAN not abandonment). Certainly, the key element of what Quaker calls the “beverage slogan registration” is the term THIRST-AID. In fact, the trademark registration for the slogan explicitly states that no claim of ownership is made as to the words “First Aid for Your Thirst” apart from the mark as it appears in the registration. If this registration were the only one for THIRST-AID that STW owned, we would not, consider the decision to drop the modifying phrase “First Aid for Your Thirst” to constitute abandonment of the mark. Cf. Forum Corp., 903 F.2d at 441 (senior user’s shortening of trademark from Forum Corporation of America to Forum Corp. did not relieve junior user of Forum Ltd. from its responsibility to avoid confusion “since the salient and memorable feature of [the senior user’s] mark is ‘Forum’ ”).
Second, even if we were to find that Middleby had abandoned the mark THIRST-AID “First Aid for Your Thirst,” we would not conclude that STW therefore had no registration rights covering the use of THIRST-AID on beverages. We do not see the wide gulf between a trademark for beverage syrups and a trademark for beverages, on which Quaker relies. Further, Quaker’s contention that STW has failed to use THIRST-AID on beverages sold “at retail” flies in the face of the district court’s findings. The district court did find that “neither plaintiff, nor any predecessor of plaintiff has ever used THIRST-AID in connection with a packaged soft drink or beverage sold in a store at retail.” Sands, Taylor & Wood, 18 U.S.P.Q.2d at 1461 (emphasis added). The court also found, however, that Middleby and STW had sold “a wide line of beverage products and syrups ... at retail to ice cream soda fountain shops.” Id. at 1459 (emphasis added). Further, the beverages made from these syrups were advertised by the soda fountains to the ultimate consumer as THIRST-AID through the use of various types of in-staré retail advertising including streamers to be put on windows as well as glasses, pitchers and dispensing barrels embossed with the mark THIRST-AID. Therefore, we conclude that Middleby’s failure to use the mark THIRST-AID “First Aid for Your Thirst” after 1949 did not constitute abandonment of the mark THIRST-AID for use on beverages.
*956 2. Intent Not to Resume Use
Alternatively, Quaker argues that even if Middleby had not abandoned the “beverage slogan registration,” any right to use the THIRST-AID marks for a beverage was abandoned by Karp, which acquired the marks in December 1981.[8] Quaker relies on the testimony of Karp’s vice president and chief financial officer that Karp did not intend to use THIRST-AID for a beverage when it acquired the marks. This argument misses the point. While it is true that Karp did not use THIRST-AID for a beverage, it is also the case that, approximately Vk years after acquiring the marks, Karp hired a consultant for the specific purpose of attempting to license THIRST-AID for use on a beverage. “[T]he owner of the trademark need only produce evidence to rebut the presumption [of abandonment] while the ultimate burden of persuasion rests .on the defendant.” Roulo, 886 F.2d at 938. The district court found that STW’s efforts to license THIRST-AID for use on a soft drink during this period were sufficient evidence of intent to resume use to rebut a prima facie case of abandonment. Although the district court erred in focusing on the intent of STW rather than of Karp during the three years that Karp owned the marks,[9] the court at least implicitly found that Karp’s efforts to license THIRST-AID to Shasta and Tropicana were sufficient to establish Karp’s intent to resume use.[10] Karp did not abandon the right to use THIRST-AID for a beverage.
B. Abandonment Through Assignment in Gross
As the district court noted, “[t]he transfer of a trademark apart from the good will of the business which it represents is an invalid ‘naked’ or ‘in gross’ assignment,” which passes no rights to the assignee. Sands, Taylor & Wood, 18 U.S.P.Q.2d at 1464. Quaker contends that the court erred in concluding that the September 1984 assignment of the THIRST-AID trademarks from Karp to STW was not an invalid assignment in gross. Quaker recognizes that transfer of a mark need not be accompanied by the transfer of any physical or tangible assets in order to be valid. “All that is necessary is the transfer of the goodwill to which the mark pertains.” Visa, U.S.A., Inc. v. Birmingham Trust Nat’l Bank, 696 F.2d 1371, 1377 (Fed.Cir.1982); see also Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 676 (7th Cir.1982) (“[I]t is not necessary to the continuing validity of the mark that tangible assets of the assignor pass to the assignee.”). According to Quaker, however, any good will associated with the THIRST-AID mark existed only in the institutional market, and therefore could not support the transfer of the right to use THIRST-AID on a beverage at retail. We disagree with both Quaker’s characterization of the facts and its conclusion.
Quaker’s argument that any good will associated with THIRST-AID could exist only in the institutional market simply ignores STW’s evidence, accepted by the district court, that from 1921 until at least 1976 the THIRST-AID mark was used in retail, in-store advertising and promotional materials provided to soda fountains that sold beverages made from THIRST-AID syrups. As the district court found, this use of the mark, as well as its use on the Pet product, created good will associated with THIRST-AID at the retail level. This good will, built up over more than fifty *957 years, could not dissipate during the three and one-half years between the Pet.test-market and the assignment of the marks from Karp to STW. Defiance Button Machine Co. v. C & C Metal Prods. Corp., 759 F.2d 1053, 1061 (2d Cir.1985).
The 1981 agreement between STW and Karp, the validity of which Quaker does not challenge, assigned to Karp “all of [STW’s] right, title, ownership and interest in and to the Trademarks and all goodwill appurtenant thereto.” (Emphasis added.) The agreement then licensed back to STW “the exclusive right and license” to use the marks in connection with certain defined “Products” in the retail trade only. None of the defined products were beverages or beverage-related. Thus, as the district court correctly found, the 1981 agreement conferred on Karp “extremely broad rights of ownership,” Sands, Taylor & Wood, 18 U.S.P.Q.2d at 1467-68, including the exclusive right to use THIRST-AID on beverages and the good will associated with that use. Id. at 1466.
Under the 1984 agreement between STW and Karp, Karp assigned to STW “all right, title and interest in and to the trademark and the said registrations including the continued exclusive right to use the trademark THIRST-AID in the retail trade field only, together with any goodwill of the business symbolized by the trade-mark____” Karp retained the “exclusive right and license in perpetuity to use the trademark THIRST-AID in connection with the manufacture, marketing, sale and other commercialization of the Products in institutional trade only and not in retail trade.” Thus, the 1984 agreement transferred back to STW the exclusive right to use THIRST-AID on a beverage, together with the good will associated with that use.[11] As we have already noted, that good will existed at the retail as well as at the institutional level, and it was not dissipated during the three and one-half years between the Pet test-market and the 1984 assignment. The district court did not err in finding that the assignment from Karp to STW was valid.
IV.
A. Reverse Confusion
The “keystone” of trademark infringement is “likelihood of confusion” as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential cus: tomers. 2 McCarthy, supra § 23:1, at 42-43, 46-47. Usually, the confusion alleged is “forward confusion,” which occurs “when customers mistakenly think that the junior user’s goods or services are from the same source as or are connected with the senior user’s goods or services.” Id. at 48. In such a case, the junior user attempts to capitalize on the senior user’s good will and established reputation by suggesting that his product comes from the same source as does the senior user’s product. Big O Tire Dealers v. Goodyear Tire & Rubber Co., 561 F.2d 1365 (10th Cir.1977); 2 McCarthy, supra § 23:1, at 48.
In this case, however, STW relies not on classic forward confusion but on the doctrine of “reverse confusion.” Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user’s mark. Nonetheless, the senior user is injured because
[t]he public comes to assume that the senior user’s products are really the junior user’s or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark — its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.
Ameritech, Inc. v. American Information Technologies Corp., 811 F.2d 960, 964 (6th Cir.1987); see also Banff, Ltd., 841 F.2d at *958 490-91; Big O Tire Dealers, 561 F.2d at 1372. Although this court has not previously recognized reverse confusion as the basis for a claim under the Lanham Act, several other circuits have endorsed the concept.[12] We agree with those courts that “the objectives of the Lanham Act — to protect an owner’s interest in its trademark by keeping the public free from confusion as to the source of goods and ensuring fair competition — are as important in a case of reverse confusion as in typical trademark infringement.” Banff, Ltd., 841 F.2d at 490. We therefore hold that reverse confusion is a redressable injury under the Lan-ham Act.
Quaker does not really dispute the validity of the reverse confusion theory. Rather, Quaker argues that there is no likelihood of confusion of any sort here because STW has no “product in commerce” about which customers could be confused. We now turn to that issue.
B. Likelihood of Confusion
Modern trademark law prohibits use of a senior user’s mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be “closely related” to the senior user’s. International Kennel Club, 846 F.2d at 1089. A “closely related” product is one “which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.” 2 McCarthy, supra § 24:3, at 166; see also International Kennel Club, 846 F.2d at 1089. Thus, the use of the mark VERA on cosmetics and perfume has been found to infringe the mark VERA on designer apparel and household linens. Scarves by Vera, Inc. v. Todo Imports, Ltd., 544 F.2d 1167 (2d Cir.1976); see also International Kennel Club, 846 F.2d at 1089 (use of INTERNATIONAL KENNEL CLUB mark on toy dogs likely to cause confusion as to source with International Kennel Club of Chicago, a sponsor of purebred dog shows); James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266 (7th Cir.1976) (SIGN OF THE BEEFEATER restaurants creates likelihood of confusion with BEEFEATER gin); Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 (9th Cir.1963) (use of BLACK & WHITE on beer creates likelihood of confusion with BLACK & WHITE scotch whiskey).
One of the reasons courts have given for protecting trademark owners against the use of confusingly similar marks on closely related products is to protect the owner’s ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future. Interpace Corporation v. Lapp, Inc., 721 F.2d 460, 464 (3d Cir.1983); 2 McCarthy, supra § 24:5, at 177. Protecting the trademark owner’s interest in capitalizing on the good will associated with its mark by moving into new markets is especially compelling in the context of a reverse confusion case, where the junior user so overwhelms the senior user’s mark that the senior user may come to be seen as the infringer. Such a scenario is particularly likely if the senior user were to attempt to expand into the precise field where the junior user has created a strong association between its product and the senior user’s mark. “When it appears extremely likely ... that the trademark owner will soon enter the defendant’s field, this ... factor weighs heavily in favor of injunctive relief.” Interpace, 721 F.2d at 464.
In this case, STW has manifested a serious intent to market (or license someone else to market) an isotonic beverage in direct competition with Gatorade under the THIRST-AID name. Karp continued those efforts during the period that it owned the THIRST-AID marks. Those efforts might well have been successful but for Quaker’s *959 “Thirst Aid” campaign,[13] The Pet test product is a fair representation of what an isotonic beverage marketed by STW or its licensee would look like. As Quaker notes, the district court’s finding of likelihood of confusion was based largely on the Pet test product. The district court did not err in taking this approach, despite the fact that the Pet product is not currently on the market. Cf. Roulo, 886 F.2d at 937-38 (finding likelihood of confusion between defendant’s product and plaintiff's product, although the latter had not been on market for more than two years).
Nor do we find any merit in Quaker’s challenge to the district court’s determination that there would likely be confusion between Gatorade and an isotonic beverage marketed by STW under the name THIRST-AID. This court has identified seven factors to be used in analyzing likelihood of confusion:
The degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the areas and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant’s mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another.
Forum Corp., 903 F.2d at 439 (quoting McGraw-Edison v. Walt Disney Prods., 787 F.2d 1163, 1167-68 (7th Cir.1986)). Quaker argues that the district court misapplied (or failed to apply) all but one of these factors. The trial court’s ultimate conclusion as to likelihood of confusion is a finding of fact, which we review under the clearly erroneous standard. Id. at 438. We do, however,, “review the district court’s statement of the law de novo for legal error and its conclusions for signs that the court’s application of the law was infected with legal error.” Id.
Quaker argues, first, that the district court erred in finding a likelihood of confusion because it failed even to consider the strength of STW’s mark. According to Quaker, the “extensive” use of the words “thirst aid” on other products “establishes the weakness of plaintiff’s marks and weighs heavily against a finding of likelihood of confusion.” Br. at 22-23. Although Quaker is correct that the district court failed to factor in the strength of STW’s mark, we disagree with Quaker as to the significance of that factor in this case. “Whether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related.” 1 McCarthy, supra § 11:24, at 505-06. Here, both the marks and the goods — Quaker’s Gatorade and the isotonic beverage that STW would market but for Quaker’s actions — are virtually identical.
Further, “[t]he term ‘strength’ as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source.” McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir.1979). In a reverse confusion case, then, it may make more sense to consider the strength of the mark in terms of its association with the junior user’s goods. Here, there was abundant evidence that consumers strongly associate the words “thirst aid” with Gatorade,[14] even when those words appear on a *960 product label along with a different brand name.[15] Thus, to the extent that the district court erred in failing to consider the strength of the THIRST-AID mark, that error did not tend to favor STW.
Quaker also argues that the district court erred in finding that the marks are similar because the court (1) “incorrectly relied on the Pet product and on plaintiffs registrations” and (2) failed to consider that Quaker’s “Thirst Aid” ads always included the well-known brand name “Gatorade.” The first of these arguments is clearly foreclosed by our conclusion, above, that the district court correctly relied on the Pet product in determining likelihood of confusion; both the Pet label and STW’s registrations are appropriate evidence of how the THIRST-AID mark would appear on an isotonic beverage marketed by STW, particularly since STW, as the senior user, has no obligation to label its product in such a way as to avoid confusion with Quaker’s product. Forum Corp., 903 F.2d at 440. As for the second argument, it is precisely the strong association between Gatorade and “Thirst Aid” created by Quaker’s ads that is likely to create confusion in this case. Under the circumstances, the linking of the plaintiffs’ mark with the defendant’s brand name is an aggravation, not a justification. See International Kennel Club, 846 F.2d at 1088.
Quaker also argues that the district court erred in finding similarity of products and distribution chains because it relied on the Pet product. Again, this claim is foreclosed by our conclusion that the district court’s reliance was appropriate.
Quaker next contends that the district court’s finding that there was “no evidence of actual confusion by any customers” precludes any likelihood of confusion. As we have stated many times, however, the plaintiff need not show actual confusion in order to establish likelihood of confusion. International Kennel Club, 846 F.2d at 1090; Helene Curtis Industries, Inc. v. Church and Dwight Co., 560 F.2d 1325, 1330 (7th Cir.1977); Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 611-13 (7th Cir.1965); see also 2 McCarthy, supra § 23:2, at 50-51. The Weilbacher slogan study,[16] which showed a strong association between Gatorade and “Thirst Aid” on the part of consumers, tends to show that consumers faced with an isotonic beverage marketed under the name “Thirst Aid” would be likely to think it was produced either by the manufacturer of Gatorade or by another manufacturer who was trading off Gatorade’s good will.
Further, we think that the district court erred in rejecting STW’s evidence of another study performed by Weilbacher in which 24 percent of customers who were shown the label from the Pet test product stated that they thought the product was produced by Gatorade.[17] This is precisely the sort of study that this court has held to be the correct methodology for assessing consumer confusion. James Burrough, 540 F.2d at 278-79. The district court, however, refused to rely on the study because it did not expose the consumer to a product which he or she would find in the current marketplace. Given the court’s use of the Pet product in assessing other factors and our view that the Pet product fairly represents the isotonic beverage STW would like to market but for Quaker’s “Thirst Aid” campaign, we think that the district court erred in finding this evidence not probative of confusion. The Weilbacher label study clearly demonstrates that consumers would be likely to confuse an isotonic beverage marketed under the name “Thirst Aid” with Gatorade unless the producer of the new beverage made some special effort to distinguish its product. As we have noted, however, the senior user of the mark has no duty to take such measures.
Finally, Quaker contends that the district court erred in considering Quaker’s intent in analyzing likelihood of confusion. We *961 agree. Even in a traditional case of forward confusion the defendant’s intent is relevant to the issue of likelihood of confusion only if he intended “to palm off his products as those of another,” thereby profiting from confusion. Forum Corp., 903 F.2d at 439. In a reverse confusion case, of course, the defendant by definition is not palming off or otherwise attempting to create confusion as to the source of his product. Thus, the “intent” factor of the likelihood of confusion analysis is essentially irrelevant in a reverse confusion case. As the district court noted, however, “[a] finding of fraudulent intent or bad faith is not essential to prove infringement where likelihood of confusion already exists.” Sands, Taylor & Wood, 18 U.S.P.Q.2d at 1471 (citing Henri’s Food Products Co., Inc. v. Kraft, Inc., 717 F.2d 352, 359 (7th Cir.1983); Tisch Hotels, 350 F.2d at 613). The district court’s analysis of the other factors is sufficient to support its finding that there was a likelihood of confusion and, therefore, infringement.
V.
The district court awarded STW ten per-, cent of Quaker’s profits on sales of Gatorade for the period during which the “Thirst Aid” campaign ran — $24,730,000— based on its finding that Quaker had acted in bad faith. The court also ordered Quaker to pay STW’s attorney’s, fees, again based on the finding of bad faith, as well as prejudgment interest on the award of profits beginning from May 12, 1984. Quaker challenges all three of these rulings.
A. Profits
Quaker argues that an award of its profits was inappropriate here because there was no evidence that Quaker intended to trade on STW’s good will or reputation; indeed, such an intent is necessarily absent in a reverse confusion case. According to Quaker, an award of the defendant’s profits is justified only where the defendant has been unjustly enriched by appropriating the plaintiff’s good will. There is some support for this position in the case law. “To obtain an accounting of profits, the courts usually require that defendant’s infringement infer some connotation of ‘intent,’ or a knowing act denoting an intent, to infringe or reap the harvest of another’s mark and advertising.” 2 McCarthy, supra § 30:25, at 498. The law of this circuit is not, however, so limited. As we stated in Roulo:
The Lanham Act specifically provides for the awarding of profits in the discretion of the judge subject only to principles of equity. As stated by this Court, “The trial court’s primary function is to make violations of the Lanham Act unprofitable to the infringing party.” [citation omitted] Other than general equitable considerations, there is no express requirement that the parties be in direct competition or that the infringer wilfully infringe the trade dress to justify an award of profits, [citation omitted] Profits are awarded under different rationales including unjust enrichment, deterrence, and compensation.
886 F.2d at 941. This broader view seems to be more consistent with the. language of. the Lanham Act than is the narrower (though perhaps more logical) rule espoused by Quaker. 2 McCarthy, supra § 30:28, at 514-15- We decline to adopt Quaker’s restrictive interpretation in light of Seventh Circuit precedent.
Nevertheless, we are mindful of the fact that awards of profits are to be limited by “equitable considerations.” The district court justified the award of profits based on its finding that Quaker acted in bad faith. The evidence of bad faith in this case, however, is pretty slim. The court based its finding on (1) Quaker’s “failure to conduct a basic trademark search until days before the airing of the Thirst Aid commercial,” and its “anonymous, cursory investigations” of Karp’s use of the mark once it obtained such a search; (2) Quaker’s decision to continue with the “Thirst Aid” campaign after it discovered Karp’s registrations; (3) the fact that Quaker did not seek a formal legal opinion regarding potential trademark issues until after the first “Thirst Aid” commercials were aired; and (4) Quaker’s failure to take “reasonable precautions” to avoid the likelihood of *962 confusion. Sands, Taylor & Wood, 18 U.S.P.Q.2d at 1472-73.
None of these facts is particularly good evidence of bad faith. For example, Quaker’s in-house counsel, Lannin, testified at trial that his review of the “Thirst Aid” campaign in February or March of 1984 did not include a trademark search because he concluded that the proposed advertisements used the words “Thirst Aid” descriptively, and not as a trademark, and therefore did not raise any trademark issues. The district court apparently accepted this testimony, but nonetheless found Quaker’s failure to investigate indicative of bad faith. Further, the court stated that it is a “close question” whether “Thirst Aid” is a descriptive term. Indeed, this court has found that the district court erred in concluding that “Thirst Aid” was not descriptive as a matter of law. A party who acts in reasonable reliance on the advice of counsel regarding a close question of trademark law generally does not act in bad faith. Cuisinarts, Inc. v. Robot-Coupe Int’l Corp., 580 F.Supp. 634, 637 (S.D.N.Y.1984).
Nor does Quaker’s decision to proceed with the “Thirst Aid” campaign once it learned of Karp’s registrations necessarily show bad faith. Based both on his earlier conclusion that “Thirst Aid” was descriptive and on his investigation into Karp’s use of the term, which revealed that Karp was not currently using the THIRST-AID mark on any products sold at retail, Lannin concluded that Quaker’s ads did not infringe Karp’s rights in its marks. That conclusion was confirmed by the opinion Quaker obtained a few weeks later from its outside counsel, which concluded that Quaker was making a fair use of “Thirst Aid” because “ ‘Thirst-Aid’ [sic] is not used as a trademark on the product but rather clearly as a positioning statement or claim in advertising. It is used descriptively to inform the purchaser that the product will aid your thirst, and as a play on the words ‘First Aid.’ ” Mem. re Use of Term “Thirst-Aid” as Advertising Claim for Gatorade at 7-8 (undated). “The fact that one believes he has a right to adopt a mark already in use because in his view no conflict exists since the products are separate and distinct cannot, by itself, stamp his conduct as in bad faith.” Nalpac, Ltd. v. Corning Glass Works, 784 F.2d 752, 755 (6th Cir.1986) (quoting Mushroom Makers, Inc. v. R. G. Barry Corp., 441 F.Supp. 1220, 1230 (S.D.N.Y.1977), aff'd, 580 F.2d 44 (2d Cir.1978)). Even the defendant’s refusal to cease using the mark upon demand is not necessarily indicative of bad faith. Absent more, courts should “not make an inference of bad faith from evidence of conduct that is compatible with a good faith business judgment.” Munters Corp. v. Matsui America, Inc., 730 F.Supp. 790, 799-800 (N.D.Ill.1989), aff'd, 909 F.2d 250 (7th Cir. 1990).
Quaker’s failure to obtain a formal legal opinion from outside counsel until after the “Thirst Aid” campaign began is similarly weak evidence of bad faith. Given Lan-nin’s sincere, reasonable conclusion that Quaker’s ads used “Thirst Aid” descriptively, so that no trademark issue was raised, Quaker had no reason to seek the opinion of outside trademark counsel. Similarly, Quaker had no reason to take any precautions to avoid likelihood of confusion; Quaker’s research had revealed that there was no product about which people were likely to be confused.[18]
A determination of bad faith is a finding of fact subject to the clearly erroneous standard of review. Web Printing Controls Co. v. Oxy-Dry Corp., 906 F.2d 1202, 1205 n. 3 (7th Cir.1990). We cannot say on this record that the district *963 court’s conclusion was clearly erroneous. We do think, however, that the evidence of bad faith here is marginal at best. Further, this is not a case where the senior user’s trademark is so well-known that the junior user’s choice of a confusingly similar mark, out of the infinite number of marks in the world, itself supports an inference that the junior user acted in bad faith. 2 McCarthy, supra § 23:33, at 147. There is no question that Quaker developed the “Thirst Aid” campaign entirely independently, with no knowledge of STW’s marks. In such a case, an award of $24 million in profits is not “equitable”; rather, it is a windfall to the plaintiff. Quaker may have been unjustly enriched by using STW’s mark without paying for it, but the award of profits bears no relationship to that enrichment. A reasonable royalty, perhaps related in some way to the fee STW was paid by Pet, would more accurately reflect both the extent of Quaker’s unjust enrichment and the interest of STW that has been infringed. We therefore reverse the district court’s award of profits and remand for a redetermination of damages. A generous approximation of the royalties Quaker would have had to pay STW for the use of the THIRST-AID mark had it recognized the validity of STW’s claims seems to us an appropriate measure of damages, although perhaps not the only one. In any event, we can conceive of no rational measure of damages that would yield $24 million.[19]
B. Attorney’s Fees
The Lanham Act provides for recovery of attorney’s fees by the prevailing party in “exceptional cases.” 15 U.S.C. § 1117(a). The district court concluded that this was such an exceptional case based on its finding that Quaker acted in bad faith. Because we affirm that finding, we also affirm the award of attorney’s fees. The “equitable considerations” which lead us to reverse the award of profits do not apply to this issue.
C. Prejudgment Interest
As the district court noted, the Lanham Act is silent with respect to prejudgment interest. The court nevertheless decided to award such interest, relying on this Circuit’s rule that “prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation is incomplete and the defendant has an incentive to delay.” Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 436 (7th Cir.1989). Quaker argues that the Lanham Act’s silence means that prejudgment interest is not available in an action for infringement under the Act. No court of appeals has accepted this argument, and we decline to do so here. We do, however, vacate the award of prejudgment interest and remand for recalculation based on the redetermination of damages we have ordered.
VL
For the foregoing reasons, the decision of the district court is Affirmed in part, Reversed in part and Remanded for further proceedings.

. An isotonic beverage is one which is specifically formulated to replenish fluids and minerals lost by the human body, particularly through strenuous exercise.

. Although the district court stated that Quaker’s paralegal spoke only to Karp's receptionist, the paralegal’s deposition makes clear that she spoke to two people, only one of whom was the receptionist. The position of the other person is unclear, although the paralegal did testify that she had asked for someone "in sales.” Tr. at 941.

. Because THIRST-AID is a federally registered mark which STW has used continuously for over five years, the validity of the mark itself is incontestable under 15 U.S.C. § 1065. Incontestable marks are subject to only seven defenses, one of which is fair use. Id.

. The court did not reach the issue of Quaker’s good faith at the summary judgment stage.

. In its opinion following the bench trial, the district court reaffirmed its holding that “defendant's use of Thirst Aid was not descriptive of Gatorade and therefore did not constitute fair use.” Sands, Taylor & Wood, 18 U.S.P.Q.2d at 1458 n. 1. STW argues that the court’s holding thereby became a factual finding subject to review under the clearly erroneous standard. Quaker responds that nothing in the district court’s opinion following trial indicates that the court made any findings of fact as to fair use. Further, Quaker argues, that once the district court granted summary judgment on the issue of fair use it could not thereafter try that issue without notice to the parties. Leddy v. Standard Drywall, Inc., 875 F.2d 383, 386 (2d Cir.1989). We are inclined to agree. In addition, we note that even if STW were correct as a general matter, it would make no difference in this case because Quaker challenges the district court's ruling based on its use of the wrong legal test. Forum Corp., 903 F.2d at 439 (court must "make sure that the district court’s trademark classification was based on correct legal standards”).

. Further, STW’s experts testified at trial that Gatorade’s use of the words "Thirst Aid” "tells the public that Gatorade is thirst quenching," that it “quenches thirst and aids a person who is thirsty.” Tr. at 192-94 (Direct Examination of William M. Weilbacher). Although that evidence was not before the district court on sum- ' mary judgment, it does suggest that Quaker could have put on more evidence to the same effect had the fair use issue been tried.

. See 1 J. Thomas McCarthy, Trademarks and Unfair Competition § 11:17, at 477 (2d ed.1984) (hereinafter "McCarthy") (noting “some confusion in the case law as to whether 'fair use’ is really a distinct and separate 'defense' or whether it is merely one manner of use which is not likely to confuse customers,” and arguing that “ 'fair use’ should be viewed as merely one type of use which is not likely to cause confusion”).

. Quaker also argues that STW has.no registration rights covering the use of THIRST-AID for a beverage because Karp never used and never intended to use THIRST-AID "First Aid for Your Thirst.” For the reasons discussed above, we find this argument to be without merit.

. See infra at 957 (affirming district court’s holding that the 1981 agreement between STW and Karp conferred "extremely broad rights of ownership” on Karp, while the license back to STW ”limit[ed] use of the mark to" certain defined products which did not include beverages).

. Sands, Taylor & Wood, 18 U.S.P.Q.2d at 1464 n. 5 (describing efforts of Karp’s agent, Forbes, to license THIRST-AID for soft drinks at retail, and concluding that those efforts "do not evidence plaintiff’s intent to resume use of the mark at retail” because Forbes "was not acting on plaintiffs behalf") (emphasis added).

. Although the efforts of Forbes to license THIRST-AID for use on an isotonic beverage on behalf of Karp continued for a short period after the September 11, 1984 assignment of the THIRST-AID marks back to STW, at that point those efforts were contrary to the agreement since Karp no longer had the right to license THIRST-AID for that use.

. See, e.g., Banff, Ltd. v. Federated Dep’t Stores, Inc., 841 F.2d 486 (2d Cir.1988); Fuddruckers, Inc. v. Doc’s B.R. Others, Inc., 826 F.2d 837 (9th Cir.1987); Ameritech, Inc. v. American Information Technologies Corp., 811 F.2d 960 (6th Cir. 1987); Capital Films Corp. v. Charles Fries Productions, Inc., 628 F.2d 387 (5th Cir.1980); Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365 (10th Cir.1977).

. In a June 4, 1981 letter to STW, the Director of Branded Products Marketing at Pet wrote: "it is possible, in fact likely, other grocery or dairy manufacturers may be interested in putting together the name, formula, and marketing plan elements used in our test market to effect an entry into the isotonic beverage category.” And in an October 1984 letter confirming Tropicana’s decision not to enter the isotonic beverage market at that time, the Chief Operating Officer of Tropicana wrote: "‘Thirst Aid’ as a brand name is right on strategy. However, protection of this trademark may be difficult, as I have recently seen Gatorade TV spots using Thrist [sic] Aid superimposed on the screen with the tag, 'Gatorade is Thirst Aid.’ If we were to pursue this at a later date, we would require trademark protection, as 'Thirst Aid' is a key element offered in the proposal.”

. STW’s expert, William Weilbacher, presented evidence of a study he performed in which he asked consumers to fill in the correct company or brand name to complete a given advertising slogan. 79.2% of the 375 consumers he surveyed completed the slogan "_is thirst aid" with the word "Gatorade.”

. See discussion of Weilbacher "pilot study,” infra.

. See supra note 14.

. When they were shown a label with the Pet brand name removed, the number who thought Gatorade produced or distributed the product went up to 35.4 percent.

. The district court finds it indicative of bad faith that Quaker did not contact STW after receiving its trademark search, even though STW’s name was "referenced on the trademark report." Sands, Taylor & Wood, 18 U.S.P.Q.2d at 1472. The reference to STW appears in a list of "Thirst Aid” uses found by searching various directories — in the case of STW, the Thomas Grocery Register. STW's name does not appear on any of the federal registrations that the search turned up, nor does it appear anywhere in conjunction with Karp’s name. Quaker’s failure to contact STW based on the reference in the trademark report is at best weak evidence of bad faith.

. Because neither Judge Ripple nor Judge Fair-child joins this part of the court’s opinion, it expresses the individual views of Judge Cudahy. To enable this issue to be decided by majority vote, however, Judge Cudahy has no difficulty with deferring to Judge Ripple’s view, expressed in his separate opinion, that the district court’s award of damages should be reversed and remanded for "a more precise determination” not limited to a reasonable royalty. Post at 963-64. Thus, Judges Cudahy and Ripple agree that, in recalculating the award of damages, the district court should be guided by the following principles: (1) the court may not simply award STW a percentage of Quaker’s profits; (2) the court should use a reasonable royalty as a baseline or starting point for determining the appropriate award; (3) in determining the appropriate award, the court may take into account the possible need for deterrence, which may involve consideration of the amount of Quaker’s profits.