BIG O TIRE DEALERS, INC., a Colorado Corporation, Plaintiff-Appellee,

v.

The GOODYEAR TIRE & RUBBER COMPANY, an Ohio Corporation, Defendant-Appellant.

No. 76–1199.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Jan. 25, 1977.

Decided Sept. 2, 1977.

Rehearing Denied Oct. 11, 1977.

Denis McInerney of Cahill, Gordon & Reindel, New York City (Robert Usadi, Cahill, Gordon & Reindel, New York City, Arthur K. Underwood, Jr., and W. David Pantle of Dawson, Nagel, Sherman & Howard, Denver, Colo., of counsel, and William E. Schuyler, Jr., and Alan S. Cooper of Schuyler, Birch, Swindler, McKie & Beckett, Washington, D. C., also of counsel, on the briefs), for defendant-appellant.

Michael C. Schaefer of Rutenbeck & Schaefer, Denver, Colo. (Duane C. Burton, Robert C. Dorr, of Burton & Dorr, Denver, Colo., of counsel, on the brief), for plaintiff-appellee.

Before LEWIS, Chief Judge, and PICKETT and BARRETT, Circuit Judges.

LEWIS, Chief Judge.

This civil action was brought by Big O Tire Dealers, Inc. ("Big O") asserting claims of unfair competition against The Goodyear Tire & Rubber Co. ("Goodyear") based upon false designation of origin under 15 U.S.C. § 1125(a) and common law trademark infringement. After a ten-day trial and three days of deliberation, the jury returned the following verdict:

> We the jury in the above entitled cause, upon our oath do say that we find the following as our verdict herein:
>
> Upon the claim of liability for trademark infringement we find for Big O Inc.
>
> Upon the claim of liability for false designation of origin we find for Goodyear.
>
> Upon the claim for trademark disparagement we find for Big O Inc.
>
> We find that plaintiff has proven special compensatory damages in the amount of $ None.
>
> We find that plaintiff has proven general compensatory damages in the amount of $2,800,000.
>
> We assess punitive or exemplary damages in the amount of $16,800,000.
>
> Dated September 4, 1975.

Filing a comprehensive post-trial opinion the United States District Court for the District of Colorado entered judgment on the jury's verdict, permanently enjoined Goodyear from infringing on Big O's trademark, and dismissed Goodyear's counterclaim for equitable relief. 408 F.Supp. 1219. Goodyear appeals that judgment.

Big O is a tire-buying organization which provides merchandising techniques, advertising concepts, operating systems, and other aids to approximately 200 independent retail tire dealers in 14 states who identify themselves to the public as Big O dealers. These dealers sell replacement tires using the Big O label on "private brand" tires. They also sell other companies' brands such as B. F. Goodrich and Michelin Tires. At the time of trial Big O's total net worth was approximately $200,000.

Goodyear is the world's largest tire manufacturer. In 1974 Goodyear's net sales totalled more than $5.25 billion and its net income after taxes surpassed $157 million. In the replacement market Goodyear sells through a nationwide network of company-owned stores, franchise dealers, and independent retailers.

In the fall of 1973 Big O decided to identify two of its lines of private brand tires as "Big O Big Foot 60" and "Big O Big

Foot 70." These names were placed on the sidewall of the respective tires in raised white letters. The first interstate shipment of these tires occurred in February 1974. Big O dealers began selling these tires to the public in April 1974. Big O did not succeed in registering "Big Foot" as a trademark with the United States Patent and Trademark Office.

In the last three months of 1973 Goodyear began making snowmobile replacement tracks using the trademark "Bigfoot." From October 1973 to August 1975 Goodyear made only 671 "Bigfoot" snowmobile tracks and sold only 411 tracks. In December 1973 Goodyear filed an application to register "Bigfoot" as a trademark for snowmobile tracks with the United States Patent and Trademark Office; the registration was granted on October 15, 1974.

In July 1974 Goodyear decided to use the term "Bigfoot" in a nationwide advertising campaign to promote the sale of its new "Custom Polysteel Radial" tire. The name "Custom Polysteel Radial" was molded into the tire's sidewall. Goodyear employed a trademark search firm to conduct a search for "Bigfoot" in connection with tires and related products. This search did not uncover any conflicting trademarks. After this suit was filed Goodyear filed an application to register "Bigfoot" as a trademark for tires but withdrew it in 1975. Goodyear planned to launch its massive, nationwide "Bigfoot" advertising campaign on September 16, 1974.

On August 24, 1974, Goodyear first learned of Big O's "Big Foot" tires. Goodyear informed Big O's president, Norman Affleck, on August 26 of Goodyear's impending "Bigfoot" advertising campaign. Affleck was asked to give Goodyear a letter indicating Big O had no objection to this use of "Bigfoot." When Affleck replied he could not make this decision alone, it was suggested Affleck talk with John Kelley, Goodyear's vice-president for advertising.

Affleck called Kelley and requested more information on Goodyear's impending advertising campaign. A Goodyear employee visited Affleck on August 30 and showed him rough versions of the planned Goodyear "Bigfoot" commercials and other promotional materials. On September 10, Affleck and two Big O directors met in New Orleans, with Kelley and Goodyear's manager of consumer market planning to discuss the problem further. At this time the Big O representatives objected to Goodyear using "Bigfoot" in connection with tires because they believed any such use would severely damage Big O. They made it clear they were not interested in money in exchange for granting Goodyear the right to use the "Bigfoot" trademark, and asked Goodyear to wind down the campaign as soon as possible. Goodyear's response to this request was indefinite and uncertain.

During the trial several Goodyear employees conceded it was technically possible for Goodyear to have deleted the term "Bigfoot" from its television advertising as late as early September. However, on September 16, 1974, Goodyear launched its nationwide "Bigfoot" promotion on ABC's Monday Night Football telecast. By August 31, 1975, Goodyear had spent $9,690,029 on its massive, saturation campaign.

On September 17 Affleck wrote Kelley a letter setting forth his understanding of the New Orleans meeting that Goodyear would wind up its "Bigfoot" campaign as soon as possible. Kelley replied on September 20, denying any commitment to discontinue use of "Bigfoot" and declaring Goodyear intended to use "Bigfoot" as long as it continued to be a helpful advertising device.

On October 9 Kelley told Affleck he did not have the authority to make the final decision for Goodyear and suggested that Affleck call Charles Eaves, Goodyear's executive vice-president. On October 10 Affleck called Eaves and Eaves indicated the possibility of paying Big O for the use of the term "Bigfoot." When Affleck stated no interest in the possibility Eaves told him Goodyear wished to avoid litigation but that if Big O did sue, the case would be in litigation long enough that Goodyear might obtain all the benefits it desired from the term "Bigfoot."

This was the final communication between the parties until Big O filed suit on November 27, 1974. The district court de-

nied Big O's request for a temporary restraining order and a preliminary injunction. After judgment was entered on the jury's verdict for Big O, Goodyear appealed to this court. Goodyear's allegations of error are discussed below.

I.

The district court instructed the jury it must decide whether "the term BIG FOOT [is] merely descriptive of a quality or characteristic of the Big O BIG FOOT 60 and Big O BIG FOOT 70 tires." The court further charged the jury that if it decided "Big Foot is merely descriptive as applied to these Big O tires, then [it must] consider whether the evidence shows that before September 16, 1974, the plaintiff had so used Big Foot as to develop a secondary meaning such as to associate that term with Big O Tire Dealers, Inc. in the minds of a significant number of the consuming public."

Goodyear argues that Big Foot is descriptive in nature as a matter of law or fact and that the evidence is not sufficient to support the issue of secondary meaning and therefore Goodyear is entitled to judgment notwithstanding the verdict. Goodyear bases its descriptiveness argument on the premise that "Big Foot" is a combination of two common English words which together are descriptive of the big footprint characteristic of tires. At trial, Goodyear presented evidence showing it had used the term "BIG FOOT TRACTION" in brochures produced in 1964 and 1969. Goodyear also presented evidence of the use of the term "footprint" in connection with tires.

Big O presented evidence that it adopted the mark "Big Foot" after the Abominable Snowman, or the Sasquatch Monster Bigfoot. Thus, Big O asserts the term "Big Foot" is totally arbitrary in relation to automobile tires, having no descriptive significance.

■ Words which are merely descriptive of the qualities, ingredients, or composition of an article cannot be appropriated as a trademark and are not entitled to protection unless they have acquired a secondary meaning. *Armstrong Paint & Var-*

*nish Works v. Nu-Enamel Corp.,* 305 U.S. 315, 335–36, 59 S.Ct. 191, 83 L.Ed. 195. In testing the validity of common law trademarks the critical question is what the designation meant to the purchasing public; not what the designation meant to those in the industry. *Blisscraft of Hollywood v. United Plastics Co.,* 2 Cir., 294 F.2d 694, 699. Mindful of these principles, we hold the trial court did not err in refusing to rule as a matter of law that "Big Foot" is merely descriptive of the big footprint characteristic of tires.

In *Blisscraft of Hollywood v. United Plastics Co., supra,* the court held the term "Poly Pitcher" was not descriptive of a polyethylene pitcher. The Court of Appeals for the Second Circuit pointed out that no evidence was presented that the public generally understood "poly" to be synonymous with polyethylene or that "Poly Pitcher" meant a pitcher which was made of polyethylene. The court also emphasized "Poly Pitcher" was a coined or fanciful mark since it was suggestive of Molly Pitcher of Revolutionary fame.

Likewise, in the instant case Goodyear presented no evidence that tire purchasers considered "Big Foot" to be descriptive of tires and evidence was presented that "Big Foot" evokes association with the Sasquatch Monster. Moreover, the fact that Goodyear filed an application after the commencement of this suit to register "Big Foot" as a trademark for tires in the United States Patent and Trademark Office weakens its position that "Big Foot" is a descriptive term. *Independent Nail & Packing Co. v. Stronghold Screw Products, Inc.,* 7 Cir., 205 F.2d 921, 925, *cert. denied,* 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391.

■ As for Goodyear's argument that the issue of secondary meaning should not have been submitted to the jury, Big O concedes it presented no evidence that "Big Foot" had acquired a secondary meaning indicating origin in Big O before Goodyear's use of "Bigfoot" on September 16, 1974. We thus agree with Goodyear's contention that secondary meaning was not a viable issue in the case and should not have been submitted to the jury. However, the im-

proper submission of a question of fact to the jury is not fatal to a verdict unless the substantial rights of the parties are prejudiced. Fed.R.Civ.P. 61; *Ollier v. Lake Central Airlines, Inc.,* 6 Cir., 423 F.2d 554, 556. In the case at bar the court clearly limited the issue of secondary meaning as one to be considered only if the jury first found the trademark to be descriptive in nature and that a descriptive trademark, per se, had no protection and both parties could use the term concurrently. Big O did not argue secondary meaning and Goodyear's objection was to the form of the instruction only.

We are satisfied that in view of the entire charge and length and complexity of the case, the reference to secondary meaning could not have misled the jury. *Cf. Gardner v. General Motors Corp.,* 10 Cir., 507 F.2d 525, 529; *Westric Battery Co. v. Standard Electric, Co.,* 10 Cir., 482 F.2d 1307, 1315–16; *Ollier v. Lake Central Airlines, Inc.,* supra, at 556. Goodyear's contention that the words "significant number" of people could be understood by the jury to mean only one or two is totally devoid of merit. Other objections to the form of this instruction are extended on appeal but need not now be considered.

### II.

 Goodyear challenges the court's instructions on descriptiveness. The challenged instruction states:

> In this case, Big O Tire Dealers, Inc. claims that by September 16, 1974, it had established the term BIG FOOT as a trademark for two types of automobile tires sold by it: the Big O BIG FOOT 60 and the Big O BIG FOOT 70 tires.
>
> To this claim the defendant Goodyear has raised the *affirmative defense* that the term BIG FOOT is merely descriptive of a quality or characteristic of these Big O tires and it is not distinctive.

(Emphasis added.) Goodyear's objection to this instruction is based on the court's use of the term "affirmative defense." By labeling descriptiveness as an affirmative defense, Goodyear contends the court erroneously put the burden of proving descriptiveness on Goodyear.

Goodyear insists Big O had the burden of proving "Big Foot" was not descriptive. However, the only case Goodyear cites in connection with this proposition, *Popular Mechanics Co. v. Fawcett Publications, Inc.,* D.Del., 1 F.Supp. 292, does not deal with the burden of proof on the descriptiveness issue. On the other hand, Big O is unable to cite any authority for the proposition that descriptiveness is an affirmative defense.

Big O had the burden of proving it had a valid common law trademark. *House of Westmore, Inc. v. Denney,* 3 Cir., 151 F.2d 261, 265. Moreover, words which are merely descriptive of a product or its characteristics are not subject to protection as trademarks. *Bardahl Oil Co. v. Atomic Oil Co.,* 10 Cir., 351 F.2d 148, 150. However, a distinctive mark is entitled to common law trademark protection. *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.,* E.D.Pa., 350 F.Supp. 1341.

In considering the instructions as a whole, we are unable to conclude the trial court committed prejudicial error in labeling descriptiveness as an affirmative defense. The jury was instructed it must find from a preponderance of the evidence that Big O had established "Big Foot" as a trademark for its tires before September 16, 1974. The jury was also instructed that distinctive words are entitled to trademark protection. Coined, fanciful, or arbitrary words were defined as distinctive, but the court charged descriptive words were not distinctive unless they had acquired a secondary meaning.

In hindsight we believe the district court should not have labeled descriptiveness as an affirmative defense. However, the jury was instructed Big O must prove its case by a preponderance of the evidence and distinctiveness was charged as an element of Big O's case. Since distinctiveness was defined as the converse of descriptiveness in the instructions, implicit in the jury's finding of trademark infringement is a finding of nondescriptiveness. Thus, the court's instruction on descriptiveness is not inconsistent with substantial justice. As we so aptly said in *Gardner v. General Motors Corp.,* 10 Cir., 507 F.2d 525, 528:

In a complex case such as this we have yet to discover an instance where hindsight might not suggest some improvement in the most difficult field of jury instructions.

Goodyear further contends the testimony of Big O's trademark law expert aggravated the errors in the court's instructions. We disagree. The conduct of the trial and the admission of expert testimony is within the discretion of the district court. There is no indication the court abused its discretion in allowing Big O's trademark law expert to testify. Moreover, the district court specifically cautioned the jury before the expert testified and again in its instructions that the jury was to disregard any of the expert's testimony that was inconsistent with the court's instructions.

### III.

■ During the trial Goodyear raised an affirmative defense based on the extension doctrine claiming its prior use of "Bigfoot" on snowmobile tracks entitled it to use "Bigfoot" on tires. Goodyear contends the court's charge on its extension defense constituted reversible error. Specifically, Goodyear claims the instructions erroneously imposed on it unnecessary burdens of proof and deprived it of the statutory presumptions to which it was entitled.

In considering the instructions as a whole we are convinced they did not impose unnecessary burdens of proof on Goodyear or deprive Goodyear of its statutory presumptions. The court charged the jury that the legal effect of Goodyear's registration of "Bigfoot" as a mark for snowmobile tracks "is to create a presumption . . . that Goodyear established BIGFOOT as a trademark for snowmobile track . . . and that it has continuously used this trademark for snowmobile track since that time and has the exclusive right to do so." This is an accurate statement of the presumption to be given the valid registration of a mark and all of Goodyear's allegations of error in the extension instruction are picayunish at best. The uncontroverted evidence shows Goodyear manufactured only 671 tracks and not all these were sold or even shipped.

### IV.

The district court charged the jury:

A trademark is infringed when a second person (later user) uses it in a manner which is likely to cause confusion among ordinarily prudent purchasers or prospective purchasers as to the source of the products. The test is not one of actual confusion; it is the likelihood of confusion.

The effect of this instruction was to permit the jury to base liability on a likelihood of any kind of confusion. Big O does not claim nor was any evidence presented showing Goodyear intended to trade on the goodwill of Big O or to palm off Goodyear products as being those of Big O. Instead, Big O contends Goodyear's use of Big O's trademark created a likelihood of confusion concerning the source of Big O's "Big Foot" tires.

The facts of this case are different from the usual trademark infringement case. As the trial judge stated, the usual trademark infringement case involves a claim by a plaintiff with a substantial investment in a well established trademark. The plaintiff would seek recovery for the loss of income resulting from a second user attempting to trade on the goodwill associated with that established mark by suggesting to the consuming public that his product comes from the same origin as the plaintiff's product. The instant case, however, involves reverse confusion wherein the infringer's use of plaintiff's mark results in confusion as to the origin of plaintiff's product. Only one reported decision involves the issue of reverse confusion. In *Westward Coach Mfg. Co. v. Ford Motor Co.*, 7 Cir., 388 F.2d 627, *cert. denied*, 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386, the court held reverse confusion is not actionable as a trademark infringement under Indiana law.

■ Consequently, Goodyear argues the second use of a trademark is not actionable if it merely creates a likelihood of confusion concerning the source of the first user's product. Since both parties agree Colorado law is controlling in this case, we must decide whether this so-called reverse confu-

sion is actionable under Colorado law. To our knowledge, the Colorado courts have never considered whether a second use creating the likelihood of confusion about the source of the first user's products is actionable. However, the Colorado Court of Appeals in deciding a trade name infringement case involving an issue of first impression, cogently pointed out that the Colorado Supreme Court

> has consistently recognized and followed a policy of protecting established trade names and preventing public confusion and the tendency has been to widen the scope of that protection.

*Wood v. Wood's Homes, Inc.*, 33 Colo.App. 285, 519 P.2d 1212, 1215–16.

Using that language as a guiding light in divining what Colorado law is on this issue of first impression, we hold that the Colorado courts, if given the opportunity, would extend its common law trademark infringement actions to include reverse confusion situations. Such a rule would further Colorado's "policy of protecting trade names and preventing public confusion" as well as having "the tendency [of widening] the scope of that protection."

The district court very persuasively answered Goodyear's argument that liability for trademark infringement cannot be imposed without a showing that Goodyear intended to trade on the goodwill of Big O or to palm off Goodyear products as being those of Big O's when it said

> The logical consequence of accepting Goodyear's position would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor. If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt any trademark and develop a new meaning for that trademark as identification of the second user's products. The activities of Goodyear in this case are unquestionably unfair competition

through an improper use of a trademark and that must be actionable.

408 F.Supp. at 1236.

Goodyear further argues there was no credible evidence from which the jury could have found a likelihood of reverse confusion. A review of the record demonstrates the lack of merit in this argument. Big O presented more than a dozen witnesses who testified to actual confusion as to the source of Big O's "Big Foot" tires after watching a Goodyear "Bigfoot" commercial. The jury could have reasonably inferred a likelihood of confusion from these witnesses' testimony of actual confusion. Moreover, two of Goodyear's executive officers, Kelley and Eaves, testified confusion was likely or even inevitable.

## V.

The district court ruled that communications between Big O and Goodyear representatives from August 26 to October 10, 1974, were not offers to compromise a dispute. Instead, the court ruled they were simply business communications and were relevant and material to show knowledge, willful infringement, and misconduct by Goodyear. Furthermore, the court ruled that evidence that Goodyear had offered to pay Big O money and the amounts of money under consideration could not be introduced. Goodyear argues the communications between the two parties constituted compromise negotiations and thus were inadmissible under Fed.R. of Evid. 408.

In reviewing this contention we are guided by the principle that the admission of evidence is largely within the discretion of the district court. Moreover, in the absence of manifest error we will not reverse a district court's decision to admit evidence. *Reichenbach v. Smith*, 5 Cir., 528 F.2d 1072, 1074.

Specifically, Goodyear's contention is that the communications which the district court admitted were "statements made in compromise negotiations" within the meaning of Fed.R. of Evid. 408. Rule 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valu-

able consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Since Rule 408 applies only to compromise negotiations, the district court's ruling that the communications were "simply business communications" is sustainable. A careful perusal of all the testimony relating to the communications convinces us that the court did not commit manifest error in ruling they were business communications and not compromise negotiations. The discussions had not crystallized to the point of threatened litigation, a clear cut-off point, until after October 10, the date of the conversations between Big O's president and Goodyear's executive vice-president.

## VI.

■ The district court submitted a theory of liability to the jury which the court labeled "trademark disparagement." Since Big O never pleaded such a claim for relief, Goodyear contends it was not given sufficient notice to defend against the trademark disparagement claim. A review of the record shows that the issue of disparagement was tried by implied consent of the parties. Significantly, on the second day of the trial Goodyear's counsel acknowledged awareness of this claim for relief by labeling it "disbarment [sic] of title" and citing *Landstrom v. Thorpe*, 8 Cir., 189 F.2d 46 (a suit involving the issue of disparagement of title).

Goodyear also contends Big O failed to prove the three elements of the cause of action for disparagement: (1) a false statement; (2) malice; or (3) special damages.

■ Some of Goodyear's advertising expressly said " 'Bigfoot' the new Polysteel Radial only from Goodyear" or "Bigfoot. The Polysteel Radial that keeps its feet even in the rain. Only from Goodyear." Big O asserts these statements are false; whereas Goodyear claims they are true and do not reflect adversely on Big O. Two different meanings could possibly be given to these statements: (1) The Polysteel Radial is available only from Goodyear or (2) "Bigfoot" is available only from Goodyear. The latter meaning is a false statement which disparages Big O's "Big Foot" trademark. The district court properly charged the jury it should give the words "such meaning as would naturally be given by persons of ordinary understanding and intelligence." The issue was properly submitted to the jury.

■ Goodyear argues a finding of malice is not supported by the record in this case. We disagree. The record shows that on January 2, 1975, after the filing of this lawsuit, Goodyear modified its "Bigfoot" television advertising by adding "only from Goodyear." The record shows Goodyear knew of Big O's "Big Foot" tires at least by August 26, 1974, and there was adequate time to remove the reference to "Bigfoot" from Goodyear's advertising before the September 16, 1974, telecast. As the district court said in its post-trial opinion and the jury could have found

What Goodyear did was to determine that the plaintiff was an insignificant competitor and that Goodyear's investment of time, money, and effort was too great to give up the use of the BIGFOOT material even though it would clearly damage and perhaps destroy the plaintiff's use of its trademark.

408 F.Supp. 1233.

■ Goodyear contends the district court erred in refusing to instruct the jury that a finding of special damages is a prerequisite to recovery for trademark disparagement. The district court admitted that in "defining trademark disparagement, this court did not follow any direct precedent

and none has been discovered since the trial." The district court did instruct the jury that trademark disparagement did require proof "[t]hat such false statements had an adverse economic effect upon the plaintiff's business." The court correctly acknowledged that the term "adverse economic effect" is far more inclusive than special damages.

Goodyear has not referred us to any Colorado trademark disparagement cases, nor have we been able to find any. The two Colorado cases Goodyear relies on, *Zimmerman v. Hinderlider*, 105 Colo. 340, 97 P.2d 443; *McNichols v. Conejos-K Corp.*, 29 Colo. App. 205, 482 P.2d 432, are both slander of title cases. Although slander of title is somewhat analogous to trademark disparagement those two cases are not sufficient to convince us the district court's determination of Colorado law is clearly wrong. We have stated many times that the resident trial court's determination of local law is deemed highly persuasive.

## VII.

■ Finally, Goodyear challenges the jury's verdict awarding Big O $2.8 million in compensatory damages and $16.8 million in punitive damages. Goodyear contends Big O failed to prove either the fact or the amount of damages. Big O asserts the evidence supporting the fact of damages falls into two categories: (1) Goodyear's enormous effort to adopt, use, and absorb Big O's trademark virtually destroyed Big O's ability to make any effective use of its "Big Foot" trademark and (2) Goodyear's false statements that "Bigfoot" was available only from Goodyear created the appearance of dishonesty and wrongful conduct by Big O thereby harming its reputation within the trade and with the public. We agree with the district court that there is sufficient evidence to support the jury's finding of the fact of damages.

■ Big O also asserts the evidence provided the jury with a reasonable basis for determining the amount of damages. Big O claims the only way it can be restored to the position it was in before Goodyear infringed its trademark is to conduct a corrective advertising campaign. Big O insists it should be compensated for the advertising expenses necessary to dispel the public confusion caused by Goodyear's infringement. Goodyear spent approximately $10 million on its "Bigfoot" advertising campaign.[1] Thus, Big O advances two rationales in support of the $2.8 million award: (1) there were Big O Tire Dealers in 28 percent of the states (14 of 50) and 28 percent of $10 million equals the amount of the award; and (2) the Federal Trade Commission generally orders businesses who engage in misleading advertising to spend approximately 25 percent of their advertising budget on corrective advertising and this award is roughly 25 percent of the amount Goodyear spent infringing on Big O's trademark. The district court used the first rationale in denying Goodyear's motion to set the verdict aside. The second rationale was presented by Big O at oral argument.

The purpose of general compensatory damages is to make the plaintiff whole. Big O concedes it was unable to prove with precision the amount necessary to make itself whole. However, the district court concluded "[t]he damages awarded by the jury would enable Big O to do an equivalent volume of advertising in the states in which there are Big O dealers to inform their customers, potential customers, and the public as a whole about the true facts in this dispute or anything else necessary to eliminate the confusion." 408 F.Supp. 1232. Moreover, the Supreme Court has pointed out that a plaintiff's inability to prove with precision that amount necessary to make itself whole does not preclude recovery since

> [t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652.

There is precedent for the recovery of corrective advertising expenses incurred by a plaintiff to counteract the public confu-

---

1. The parties stipulated that Goodyear spent $9,690,029 through August 31, 1975.

sion resulting from a defendant's wrongful conduct. *E. g., Petersime & Son v. Robbins*, 10 Cir., 81 F.2d 295, *cert. denied*, 299 U.S. 553, 57 S.Ct. 15, 81 L.Ed. 407; *Maytag Co. v. Meadows Mfg. Co.*, 7 Cir., 45 F.2d 299, *cert. denied*, 283 U.S. 843, 51 S.Ct. 489, 75 L.Ed. 1452; *Truzzolino Food Products Co. v. F. W. Woolworth Co.*, 108 Mont. 408, 91 P.2d 415; *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing and Pub. Ass'n*, 226 N.Y. 1, 122 N.E. 463. Unlike the wronged parties in those cases Big O did not spend any money prior to trial in advertising to counteract the confusion from the Goodyear advertising. It is clear from the record Big O did not have the economic resources to conduct an advertising campaign sufficient to counteract Goodyear's $9,690,029 saturation advertising campaign. We are thus confronted with the question whether the law should apply differently to those who have the economic power to help themselves concurrently with the wrong than to those who must seek redress through the courts. Under the facts of this case we are convinced the answer must be no. Goodyear contends the recovery of advertising expenses should be limited to those actually incurred prior to trial. In this case the effect of such a rule would be to recognize that Big O has a right to the exclusive use of its trademark but has no remedy to be put in the position it was in prior to September 16, 1974, before Goodyear effectively usurped Big O's trademark. The impact of Goodyear's "Bigfoot" campaign was devastating. The infringing mark was seen repeatedly by millions of consumers. It is clear from the record that Goodyear deeply penetrated the public consciousness. Thus, Big O is entitled to recover a reasonable amount equivalent to that of a concurrent corrective advertising campaign.

As the district court pointed out, the jury's verdict of $2.8 million corresponds to 28 percent of the approximately $10 million Goodyear spent infringing Big O's mark. Big O has dealers in 14 states which equals 28 percent of the 50 states. Big O also points out the jury's award is close to 25 percent of the amount Goodyear spent infringing on Big O's mark. Big O emphasizes that the Federal Trade Commission often requires businesses who engage in misleading advertising to spend 25 percent of their advertising budget on corrective advertising.[2]

Taking cognizance of these two alternative rationales for the jury's award for compensatory damages we are convinced the award is not capable of support as to any amount in excess of $678,302. As the district court implied in attempting to explain the jury's verdict, Big O is not entitled to the total amount Goodyear spent on its nationwide campaign since Big O only has dealers in 14 states, thus making it unnecessary for Big O to run a nationwide advertising campaign. Furthermore, implicit in the FTC's 25 percent rule in corrective advertising cases is the fact that dispelling confusion and deception in the consuming public's mind does not require a dollar-for-dollar expenditure. In keeping with " '[t]he constant tendency of the courts . . . to find some way in which damages can be awarded where a wrong has been done,' "[3] we hold that the maximum amount which a jury could reasonably find necessary to place Big O in the position it was in before September 16, 1974, vis-a-vis its "Big Foot" trademark, is $678,302. We arrive at this amount by taking 28 percent of the $9,690,-

**2.** Amstar Corp., [1973–1976 Transfer Binder] Trade Reg.Rep. (CCH) ¶ 20,356, at 20,240 (FTC 1973); American Home Products Corp., [1970–1973 Transfer Binder] Trade Reg.Rep. (CCH) ¶ 19,962, at 21,983 (FTC 1972); Sun Oil Co., [1970–1973 Transfer Binder] Trade Reg.Rep. (CCH) ¶ 19,856, at 21,871 and ¶ 20,033, at 22,020 (FTC 1972); Ocean Spray Cranberries, Inc., [1970–1973 Transfer Binder] Trade Reg. Rep. (CCH) ¶ 19,981 at 21,993 and ¶ 20,051 at 22,028 (FTC 1972); ITT Continental Baking Co., [1970–1973 Transfer Binder] Trade Reg. Rep. (CCH) ¶ 19,681, at 21,727 (FTC 1971); Coca-Cola Co., [1970–1973 Transfer Binder] Trade Reg.Rep. (CCH) ¶ 19,351, at 21,484 (FTC 1970).

**3.** *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 565, 51 S.Ct. 248, 251, 75 L.Ed. 544.

029 it was stipulated Goodyear spent on its "Bigfoot" campaign, and then reducing that figure by 75 percent in accordance with the FTC rule, since we agree with that agency's determination that a dollar-for-dollar expenditure for corrective advertising is unnecessary to dispel the effects of confusing and misleading advertising.

Under Colorado law exemplary damages must bear some relation to the compensatory award. *Barnes v. Lehman*, 118 Colo. 161, 163, 193 P.2d 273, 274. The district court in its post-trial opinion upheld the jury's punitive damage award of $16.8 million as not being disproportionate under Colorado law. We find the district court's determination of the reasonableness of a six-to-one exemplary to compensatory ratio to be persuasive, and thus we defer to the district court's interpretation of Colorado law. Therefore, in light of the reduction in compensatory damages proved, the punitive damage award is similarly reduced to $4,069,812, thus maintaining the jury's and district court's six-to-one exemplary to compensatory ratio.

We have considered the numerous other contentions presented by Goodyear as constituting error but are convinced that the hard core of the issues was presented to the jury without error or accumulation of error requiring reversal. As modified the judgment is affirmed.

The case is remanded to the trial court with directions to vacate its judgment and enter judgment in compliance with this opinion.