ALTIRA GROUP LLC, a Colorado
Limited Liability Company,
Plaintiff,

v.

PHILIP MORRIS COMPANIES INC., a
Virginia corporation; and Philip Mor-
ris Capital Corp., a Delaware corpora-
tion, Defendants.

No. Civ.A. 01–K–2344.

United States District Court,
D. Colorado.

June 18, 2002.

Thomas H. Young, Merchant & Gould, P.C., Denver, CO, for plaintiff.

Tim Atkeson, Arnold & Porter, Denver, CO, Peter Thomas Grossi, Jr., Arnold & Porter, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

### I. INTRODUCTION

Defendant Philip Morris Companies Inc. ("Philip Morris Cos.") and Defendant Philip Morris Capital Corp. ("Philip Morris Capital") (collectively, "Philip Morris") desire to adopt a new name and mark, "ALTRIA." Plaintiff, Altira Group LLC ("Altira Group"), seeks a preliminary injunction against Philip Morris to enjoin them from adopting and using the "ALTRIA" name and mark pending full trial on the merits. Jurisdiction is admitted.

### II. STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy granting a party a form of relief before it has proven its case on the merits. Because its emergency nature does not afford the usual degree of careful consideration afforded by the deliberative process of a trial, the issuance of such an injunction is one that is best done sparingly. The purpose of an injunction is to preserve the *status quo ante*, the last existing state of peaceable, uncontested conditions which preceded the pending controversy. *Mantle Ranches v. U.S. Park Service*, 945 F.Supp. 1449 (D.Colo.1996) (Kane J.) (citations omitted).

A preliminary injunction should be granted in this case if Altira Group establishes the following: (1) substantial likelihood that it will eventually prevail on the merits; (2) a showing that it will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to it outweighs whatever damage the proposed injunction may cause to Philip Morris; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). A movant may establish the "likelihood of success on the merits" requirement by showing questions "so serious, substantial, difficult and doubtful as to make the issues ripe for litigation and deserving of more deliberative investigation." *Walmer v. United States Dep't of Defense*, 52 F.3d 851, 854 (10th Cir.1995).

### III. FACTS

Philip Morris Cos., the largest consumer products company in the world, had revenues in excess of $80 billion in 2000. It comprises, among other things, Kraft Foods, Inc., Philip Morris Incorporated, Philip Morris International Inc., Miller Brewing Company, Kraft, Nabisco, Oreo, Oscar Mayer and Morris Capital. Philip Morris Cos. also offers "investment services."

Philip Morris Capital "provides lease financing for 'big ticket' assets (e.g., planes, trains, factories and hotels) for large, established companies in various industries including airlines, manufacturing, power generation and real estate." Philip Morris Capital also offers capital investment services. Philip Morris Capital's balance sheet consists of finance receivable of approximately $8.0 billion, which supports assets in excess of $20 billion, 20% of which relates to "power generation."

Altira Group was formed in 1996 as a limited liability company under the name McDermott & Associates. Altira Group's primary business is the sourcing, consummation, and management of investments, primarily in companies that develop and commercialize technology for the energy industry. Altira Group has an equity interest in an oil and gas company and has considered taking an ownership interest in several power plants. It raises capital by

means of private offerings of shares in its venture funds. In the relevant industry and general business community, Altira Group and its partners enjoy an excellent reputation for integrity, talent, and skill.

Thus far, Altira Group has sold interests in three funds. According to SEC records, 32 investments by 32 people or institutions, averaging almost $680,000 each, have been made in these three funds. In return for permitting Altira Group to sell unregulated securities, the Government imposes strict qualifications on those who may invest. Essentially, they must be either institutional investors or individuals with either a net worth of $1,000,000, or must have had income in each of the last two years of $200,000—$300,000 joint income if married—and an expectation that this level of income will rise. As a seller of privately held investment interests, Altira Group is forbidden by law to solicit or sell to the general public.

Altira Group owns a federal trademark registration for "ALTIRA" used in connection with "venture capital investment" services. U.S. Trademark Registration No. 2,146,057. "ALTIRA" is a word coined by Altira Group; it is neither descriptive nor suggestive of Altira Group's investment services. This trademark was issued on March 24, 1998. Altira Group has advertised its services under both the "ALTIRA" mark and "ALTIRA GROUP" name on a nationwide basis, including tombstone advertisements, press releases, and news articles. Additionally, Altira Group promoted the "ALTIRA" name and trademark through brochures, speaking engagements, event sponsorship, business cards, and stationery.

On November 15, 2001, Philip Morris Corp. announced in a press release that it intended to use the mark "ALTRIA" and to change its name to Altria Group, Inc. The press release did not mention Philip Morris Capital. Philip Morris has filed three intent-to-use applications to obtain trademark registrations with the United States Patent and Trademark Office for marks containing "ALTRIA" for use in connection with "charitable, shareholder, community, volunteer, arts and music and investment services." Filing Receipt for Trademark Application Nos. 2628 – 2630. Philip Morris also intends to use the new name in connection with a mosaic design logo whenever practicable.

Philip Morris admits it knew of Altira Group before issuing its November 15, 2001 press release, but was advised by in-house counsel there would be no legal bar to using the ALTRIA trademark. Philip Morris's stockholders approved the name change on April 25, 2002. Philip Morris has not yet changed its name out of deference to this proceeding.

Altira Group submits the deposition testimony of one person who claims to have been confused between "ALTIRA" and "ALTRIA." Stuart Stellar states he received an e-mail from the Altira Group President Dirk McDermott inquiring about the possibility of speaking at a conference Stellar's company was planning. As he does when receiving such inquiries, Stellar performed an Internet search before calling McDermott back. In the results of his initial search, Stellar found Philip Morris's press release regarding the name change to ALTRIA. Stellar first assumed Altira Group was part of Philip Morris, and thought it "strange that someone from Philip Morris would be interested in an energy conference." Stellar then went back and looked at McDermott's e-mail again, discovered his error, and surmised he must have typed "A-l-t-r-i-a" in the search engine instead of "A-l-t-i-r-a."

Altira Group alleges Philip Morris infringed on its federally registered trademark, pursuant to sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and

1125(a) and the common law of trademark and trade name infringement and of unfair competition. Altira Group filed its infringement claim against Philip Morris on Dec. 6, 2001. Altira filed a Motion for Preliminary Injunction on February 13, 2002. I summarily denied Philip Morris Corp.'s motion for summary judgment by Minute Order dated 5/14/02.

## IV. DISCUSSION

Altira Group's complaint arises under the Lanham Act, which provides:

> any person who uses in commerce any word, term, name, symbol, or device, ... which ... is **likely to cause confusion,** or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added). I will addresses both parties' arguments regarding the four elements of the test for preliminary injunctive relief.

A. *WHETHER ALTIRA CAN DEMON-STRATE A SUBSTANTIAL LIKE-LIHOOD OF SUCCESS ON THE MERITS.*

Altira Group's infringement claims are premised on the concept of reverse, rather than forward, confusion. Reverse confusion is recognized by the Tenth Circuit Court of Appeals as an actionable form of trademark infringement for federal purposes. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir.1999) (considering forward and reverse confusion); *Universal Money Ctrs., Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1529–30 (10th Cir.1994) (reverse confusion). Forward confusion occurs when customers mistakenly believe a jun-

ior user's goods or services are from the same source as or are connected with the senior user's goods or services. 3 J. Thomas McCarthy, *McCarthy on Trademarks* § 23.10 at 48 (2001). In such a case, the junior user attempts to capitalize on the senior user's good will and established reputation by suggesting that his product comes from the same source as does the senior user's product. *Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1371 (10th Cir.1977) (discussing identical concept as matter of Colorado common law). Reverse confusion, on the other hand,

> occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such case, the junior user does not seek to profit from the good will associated with the senior user's mark. Nonetheless, the senior user is injured because the public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir.1992) (cited favorably as a reverse confusion case in *Universal Money Ctrs.*, 22 F.3d 1527 (10th Cir.1994)).

In order to assess the likelihood of confusion, courts in the Tenth Circuit consider the following six factors:

(1) the degree of similarity between the marks;

(2) the intent of the alleged infringer in adopting its mark;

(3) evidence of actual confusion;

(4) the relation in use and manner of marketing between the goods or services marketed by the competing parties;

(5) the degree of care likely to be exercised by purchasers; and

(6) the strength or weakness of the marks.

*King of the Mountain*, 185 F.3d at 1089–90. While no one factor is dispositive, "the similarity of the marks constitutes the heart of [a likelihood of confusion] analysis." *Universal Money Ctrs.* 22 F.3d at 1530.

### 1. *Similarity of the Marks*

■ The parties agree that the similarity between the marks is tested on three levels as encountered in the marketplace: sight, sound, and meaning. *Bigfoot 4X4, Inc.* 167 F.Supp.2d at 1223. This Court should not engage in a side-by-side comparison, but instead determine "whether the alleged infringing mark will be confusing to the public when singly presented." *Bigfoot 4X4, Inc.*, 167 F.Supp.2d at 1223 (citing *Universal Money Ctrs.*, 22 F.3d at 1531).

#### a. Sight

Philip Morris presents two arguments for why ALTRIA and ALTIRA are not confusingly similar. First, it argues that in a vacuum, ALTRIA AND ALTIRA are not confusing, just as the following pairs of common words are not confusing: TRIAL and TRAIL, CAUSAL and CASUAL, DAIRY and DIARY, COMPLAINT and COMPLIANT, and MARITAL and MARTIAL.

Altira Group asserts that ALTIRA and ALTRIA are different by only one letter, and asserts that similar coined words without dictionary definitions are more difficult to distinguish from each other than similar ordinary words with dictionary definitions and an association in consumers' minds.

As such, ALTIRA and ALTRIA are more difficult to distinguish between than TRIAL and TRAIL because the words in the latter pair both have a dictionary definition and an association in consumers' minds. The Tenth Circuit has never weighed in on this issue. Altira Group cites *Krim–Ko Corp. v. Coca–Cola Bottling Co.*, 55 C.C.P.A. 903, 390 F.2d 728, 732 (1968), which states that with "coined words which are meaningless so far as the English language is concerned, slight variations in spelling or arrangement of letters are often insufficient to direct the buyer's attention to the distinction between marks."

I found similar support in *E.I. DuPont de Nemours & Co. v. Yoshida Intern., Inc.*, 393 F.Supp. 502 (D.C.N.Y.1975), which states "it is generally thought that use of similar coined words renders confusion more likely." In that case, the coined words TEFLON and EFLON were found to be similar in sight. On this point, I find Altira Group's argument to be more persuasive—the sight of ALTIRA AND ALTRIA is very similar, especially because the words do not have a dictionary definition.

Second, Philip Morris argues that the sight of the words is not confusing because ALTIRA as used in the marketplace is not similar to ALTRIA as it will be used in the marketplace because of the mosaic logo that will accompany use of the ALTRIA mark. Indeed, when viewed together, the mosaic logo in front of ALTRIA is easy to differentiate from ALTIRA without such a logo. Altira Group counters with Philip Morris's own statement that it only plans to use the name ALTRIA in connection with the mosaic design logo "whenever practicable." Moreover, Philip Morris filed a federal trademark application for the word alone, indicating that the mosaic logo will not always be used with the trademark. I agree with Altira that the appearance of the trademarks is similar

and, on that basis, is likely to lead to confusion.

### b. Sound

Philip Morris minimizes the aural similarity between ALTRIA and Altira, suggesting "the similarity of sound is about the same as that between 'tier' and 'tree,' hardly overwhelming." Altira Group counters that the names each have three syllables, the first and third of which are identical, and rhyme with each other. For the same reason I find the visual similarity between the words confusing, I find their sound to be confusing. Neither of the words, alone, has any associated meaning or dictionary definition, making slight variations in appearance or sound difficult to distinguish. *See Krim–Ko Corp.*, 390 F.2d at 732 (holding with coined words which are meaningless so far as the English language is concerned, slight variations in spelling or arrangement of letters are often insufficient to direct the buyer's attention to the distinction between marks.) One can easily imagine that these names would be uttered in business transactions or discussions conducted over the telephone. Clearly, the similarity of their sound would make them very difficult to distinguish in that context.

### c. Meaning

Apparently, Philip Morris believes the meaning of the words not to be confusing stating simply "neither ALTIRA nor ALTRIA has any meaning other than the business it signifies or will signify." Altira Group's argument is more persuasive. It again cites *Krim–Ko Corp.*, 390 F.2d at 732, which supports the contention that meaningless words are more easily confused. Therefore, because neither ALTIRA nor ALTRIA has intrinsic meaning, they are easily confused.

### 2. *Intent of Philip Morris in Choosing the ALTRIA Name and Mark*

██ The parties disagree on how to analyze intent of the parties in reverse confusion cases. Considering the state of the Tenth Circuit's authority on the issue, the disagreement is unsurprising. Altira Group urges the analysis adopted by other circuit courts that have addressed directly the intent factor in reverse confusion cases, while Philip Morris relies on Tenth Circuit authority which conflates the standard in both forward and reverse confusion cases.

Generally, intent is evaluated in forward confusion cases by determining whether the smaller, junior user intended to create confusion as to the source of its products or services in order to derive benefit from a larger, senior user's already-established reputation or goodwill. In reverse confusion cases, however, it is the larger entity that is the junior user and the loss of the trademark's value to the smaller, senior user is the harm. In reverse confusion cases, then, "the defendant by definition is not palming off or otherwise attempting to create confusion as to the source of his product. Thus, the 'intent' factor of the likelihood of confusion analysis is essentially irrelevant." *Sands*, 978 F.2d at 961. Despite having cited *Sands* favorably in *Universal*, the Tenth Circuit has unfortunately glossed over the distinction, simply invoking the standard from forward confusion cases that "[t]he proper focus [as to the intent factor is] whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Universal Money Centers*, 22 F.3d at 1532; *see also King of the Mountain*, 185 F.3d at 1091.

Philip Morris Cos., as one might expect, seizes on the Tenth Circuit's statement in *Universal* to argue Altira Group, regardless of the type of confusion alleged, must establish the forward confusion intent

standard to carry its burden on the intent factor. Altira, by contrast, looks to cases in which the intent factor was analyzed specifically in reverse confusion contexts to argue a different standard applies. This standard was adopted by the court in *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F.Supp.2d 1146, 1152 (D.Minn. 2001), which held that because the harm in reverse confusion cases is that junior user overwhelms the senior user's name rather than trades on its goodwill, the appropriate intent inquiry is whether defendant acted carelessly or otherwise culpably in selecting the allegedly infringing name. Altira Group argues that Philip Morris was in fact careless, or at least deliberately indifferent, in choosing the name ALTRIA despite knowledge that Altira Group existed and had a registered trademark on the name.

I agree with Altira Group that intent to derive benefit from the senior user's mark is the incorrect standard in reverse confusion cases. The Tenth Circuit's decisions in *Universal* and *King of the Mountain* do not compel a different conclusion. Chief Judge Tacha wrote both decisions, simply adopting the forward confusion standard without analysis or explanation in *Universal,* and then citing *Universal* for the assertion in *King of the Mountain.* In *Universal,* moreover, Judge Tacha cited favorably the Tenth Circuit's decision in *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir.1977). In *Big O,* then-Chief Judge Lewis, together with Circuit Judges Pickett and Barrett, addressed the reverse confusion intent element in an analytically identical Colorado common law cause of action for trademark infringement, rejecting Goodyear's argument in that case that liability for trademark infringement could not be imposed "without a showing that Goodyear [the junior user] intended to trade on the goodwill of Big O or to palm off Goodyear products as Big O's." 561

F.2d at 1372. The "logical consequence of accepting Goodyear's position," the Court stated, "would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor." *Id.* This analysis is entirely consistent with the Seventh Circuit's in *Sands,* and, given the citation, with approval, of both *Big O* and *Sands* in *Universal,* it is my conclusion that the Tenth Circuit, were it to take up the question of intent in reverse confusion cases under the Lanham Act directly, would adopt the standards for proving intent established there.

I adopt the analysis described by the courts in *Sands, Big O, Mars,* and *Fisons* and reject Philip Morris's assertion that Altira must prove Philip Morris intended, in adopting the ALTRIA name, to trade on Altira's goodwill and reputation. Such a requirement is inconsistent with the concept of reverse confusion recognized by the Tenth Circuit in *Universal* and *Big O Tire.* To the extent reverse confusion is actionable under the Lanham Act and common law generally, proof of forward confusion cannot be a necessary element to recovery. To hold otherwise, as the Tenth Circuit acknowledged in *Big O,* would permit "anyone with adequate size and resources [to] adopt any trademark and develop a new meaning for that trademark as identification of [its] products." *Big O Tire,* 561 F.2d at 1372.

Although I apply the standard advocated by Altira Group, I find this factor nevertheless weighs in favor of Philip Morris given the facts demonstrated, and not demonstrated, at the preliminary injunction hearing. The evidence shows Philip Morris conducted a thorough search after selecting the name ALTRIA and that its counsel made a good faith effort to deter-

mine whether "ALTRIA" would conflict with the mark protected by Altira Group. There is no indication of carelessness, indifference or otherwise culpable conduct by Philip Morris in making the selection, and I find the intent factor weighs in favor of Philip Morris for purposes of the *Lundgrin* test for preliminary injunctive relief.

### 3. *Evidence of Actual Confusion*

Evidence of actual confusion is not necessary to show a likelihood of confusion, *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir.1998), but evidence of actual confusion within the marketplace is strong evidence of a likelihood of confusion. *Universal*, 22 F.3d at 1534. At this stage in the litigation, it is difficult for Altira Group to show any actual confusion because Philip Morris has not yet advertised the ALTRIA name and mark. At this point, I am not persuaded that Mr. Stellar mistyping A–L–T–R–I–A for A–L–T–I–R–A in an internet search of Mr. McDermott's company constitutes actual confusion. The fact that he immediately rectified his mistake negates the assertion.

Moreover, evidence of actual confusion should demonstrate actual confusion among consumers within the marketplace. *Coherent, Inc. v. Coherent Tech., Inc.*, 935 F.2d 1122, 1126 (10th Cir.1991). Stellar was not an actual consumer in the marketplace. In *Universal*, the Tenth Circuit determined that one isolated incident of actual confusion is "de minimis" and insufficient to establish likelihood of confusion in Lanham Act cases. 22 F.3d at 1535. I recognize there has been no time for actual confusion to occur in the marketplace as Philip Morris has not yet changed its name, but I am persuaded by the testimony of Dr. Ross that Altira Group could have done a survey to meet its burden under this factor. I find for Philip Morris on this point.

### 4. *The Relation in Use and Manner of Marketing Between the Goods or Services Marketed By Altira Group and those of Philip Morris.*

■ A guideline for evaluating this element is that the greater similarity between the products and the services, the greater likelihood of confusion. *King of the Mountain*, 185 F.3d at 1092. Altira Group asserts that both parties use their marks in connection with "investment services," citing the trademark application Philip Morris has filed with the Patent and Trademark Office for the ALTRIA mark. Philip Morris counters that, using this criterion, only the business of Philip Morris Capital is even remotely related to that of Altira Group and therefore it is only Philip Morris Capital that could theoretically interfere with Altira Group's services. Arguing against interference, Philip Morris explains that, unlike Altira Group, Philip Morris Capital does not make equity investments in emerging companies. Rather, it provides the equity portion for lease financing of "big ticket" assets (such as planes, trains and factories) for large, established companies in various industries such as airlines, manufacturing, power generation and real estate.

To show that Philip Morris and Altira Group in part offer the same services, Altira argues that the two operate in the same markets targeting audiences that include (1) the financial community, including buy and sell side analysts, portfolio managers, and active investors; and (2) opinion leaders, college educated, high income, public policy attentive, and media attentive consumers. Moreover, similar to Altira Group, Philip Morris "continually invests in new ventures where it can leverage its physical assets and knowledge capital to create new, profitable businesses." Project Capricorn Research Summary (Oct. 9, 2001), attached as Pl.'s Ex. 21.

Altira Group states its investment services are directed toward companies that develop and commercialize technology in the energy industry, and contends twenty-percent of Philip Morris Capital's portfolio relates to power generating assets. In its written submissions and in open court, however, Philip Morris represented that Philip Morris Capital "has not and will not" conduct its business under the ALTRIA name and that its association with ALTRIA will only occur in very limited circumstances such as when required by federal or state regulations.

The evidence presented at the hearing suggests the overlap in the marketplace between the two companies is slight, if any. Philip Morris Capital is not in the venture capital business and has no plans to enter it. The evidence presented by Altira Group failed to raise questions "so serious, substantial, difficult [or] doubtful as to make the issue ripe for litigation and deserving of more deliberative investigation," *see Walmer,* 52 F.3d at 854, and I find in favor of Philip Morris on the relation in use and manner of marketing between the parties' respective services factor.

### 5. *The Degree of Care Likely to be Exercised by Purchasers*

█ The general rule is that sophisticated customers are less likely to be confused. The crux of Philip Morris's argument in this regard is that Altira Group's customers are clearly sophisticated consumers who invest in amounts of millions of dollars. Because each meets the qualifications of the SEC's Regulation D, defining an "accredited investor" as "an individual having a net worth of $1,000,000 or income of $200,000 or more in the two

most recent years; ... [or] a trust with assets in excess of $5,000,000 that is directed by a 'sophisticated person' as defined by the SEC," 17 C.F.R. § 203.501, Altira consumers are among the "most astute, cautious, financially knowledgeable, studious purchasers to be found in any marketplace." Def.'s Br. in Opp.Mot.Prelim.Inj. at 17.

Altira Group admits its current 32 customers are indeed sophisticated, but argues that the general rule does not necessarily apply with respect to "initial interest" confusion [1] or reverse confusion where the risk is that consumers will think that the senior user, Altira, is actually infringing Philip Morris's mark. Pl.'s Br. at 14 (citing *Television Enter. Network, Inc. v. Entertainment Network, Inc.,* 630 F.Supp. 244, 247 (D.N.J.1986) and *Imperial Toy Corp. v. Ty, Inc.,* 48 U.S.P.Q.2d 1299, 1998 WL 601875, *4, 1998 U.S.Dist. LEXIS 14418, *14 (N.D.Ill.1998)).

I find both cases completely distinguishable. Initial interest confusion warranted the granting of a preliminary injunction in the *Television* case specifically because deals in the television programming world "are cut over the telephone and through signatures on form contracts" such that television stations or advertising agencies could "complete a deal with plaintiff never realizing that plaintiff is not defendant." 630 F.Supp. at 247. Here, where no deal with Altira is closed without personal contact and negotiations with every consumer, the *Television* case does not support an exception to the sophisticated consumer rule. *Imperial Toy* provides even less of an analogy to the facts of this case, where the relevant consumer group consisted of

---

**1.** Here, Altira is referring to the effect of the immediate confusion that might take place as to the association with ALTRIA upon an initial view of the Altira name, that has the effect of dissuading a potential investor from investigating Altira further or setting up a personal meeting or contact.

"educated" preteen aficionados of Ty's "Beanie Baby" toys. The plaintiff in *Imperial* was a smaller manufacturer of plush toys whose "Roary" bean bag toy lion preceded Ty's introduction of a similar toy lion. Ty argued the "sophistication" of its targeted consumer group rendered confusion in that case unlikely. In a reverse confusion context, however, the court determined the sophistication of the relevant consumer group and their conditioning to detect and spurn knock-offs actually supported plaintiff's assertion regarding the likelihood of reverse confusion, i.e., sensitized Beanie Baby collectors might mistakenly believe Imperial (the senior user with respect to the "Roary" toy) was actually infringing on the trademark of Ty. 1998 WL 601875 at *4, 1998 U.S.Dist. LEXIS 14418 at *14–15. The instant case does not fit this scenario at all. The sophisticated consumer group here is that of the senior user, not the junior user, and there is no suggestion—and certainly no utility in suggesting—that Altira would be harmed by ALTRIA investors' mistaken assumption that Altira was infringing on any mark owned by ALTRIA.

Finally, Altira Group argues its relevant customer base is not limited to its current sophisticated individuals. Rather, Altira argues, its customer base includes 1) potential investors in Altira Funds; 2) potential portfolio companies within which Altira Group might invest 3) potential co-investors in Altira Fund portfolio companies; 4) potential purchasers of portfolio companies; and 5) persons with whom the portfolio companies might seek to establish business relationships, including without limitation, value-added resellers, marketing partners, companies to be acquired, executive recruits, professional service firms, recruiters, and capital raising intermediaries. Even though Altira Group's future investors might themselves be sophisticated, they might choose not to invest in Altira because they might immedi-

ately think it is associated with Philip Morris, preventing them from performing any further investigation. There may well be an initial rejection of Altira Group's investment opportunities based upon a mistaken association with Philip Morris, but at this point the assertion is purely conjectural. There was a failure of evidence on this point presented at the preliminary injunction hearing, and I find the degree of care factor weighs in favor of Philip Morris.

### 6. *The Strength Or Weakness of the Marks*

The parties disagree about how I should analyze the factor of the strength or weakness of their respective marks. Philip Morris argues the strength of the senior user's mark should be evaluated, while Altira Group argues the strength of the junior user's mark should be evaluated. Again, I find Altira's position more analytically sound and not supplanted by the uncritical application of the contrary position in *Universal,* 22 F.3d at 1533.

The more sensible analysis in reverse confusion cases is to analyze the strength of the junior user's mark in order to determine its ability to overpower that of the senior user. *See Walter v. Mattel, Inc.,* 210 F.3d 1108, 1111 n. 2 (9th Cir.2000) ("In a reverse confusion case ... the inquiry focuses on the strength of the junior mark because the issue is whether the junior mark is so strong as to overtake the senior mark."); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 231 (3d Cir.2000) ("in a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark").

The parties agree that to analyze the relative strength of a mark, one must consider the two aspects of strength: 1) conceptual strength: the placement of the mark on the distinctiveness or fanciful-suggestive-descriptive spectrum; and 2) commercial strength: the marketplace recognition of the mark. *King of the Mountain Sports*, 185 F.3d at 1093. The conceptual strength of both ALTIRA and ALTRIA is strong because both are fanciful and inherently distinctive terms. With respect to commercial strength, Philip Morris's mark is likely to be strong as it has traditionally spent large sums of money on advertising campaigns. For instance, it spent an estimated $200 million advertising a "feel good" campaign promoting its "Philip Morris" mark. Altira Group argues it is likely that Philip Morris will spend even more money to advertise its new name "ALTRIA" while it attempts to distance itself from being known only as a tobacco company. According to Altira, Philip Morris's self-proclaimed goal is to "create 90% awareness of name change in the investment community among active investors by end of 2002." Pl.'s Ex. 16 (documents labeled DPM0817).

Philip Morris does not respond to this contention because it analyzes the strength of the junior user's mark, as in cases of forward confusion. I agree with Altira that the ALTRIA mark would be strong, and find factor six weighs in Altira's favor.

### 7. *Balance of the Six Factors*

■ Balancing the six factors, I conclude the overall weight favors Philip Morris. This is a unique case where the potentially confused consumers are a limited and highly sophisticated group of investors whose business and investments are solicited and coddled on an individual basis. This, together with the failure of the evidence with respect to the relatedness of the Philip Morris/Philip Morris Capital and Altira markets, actual confusion and mal-intent on the part of Philip Morris, outweighs the factors of similarity and strength of the marks that favored Altira.

Because the evidence presented fails to raise questions "so serious, substantial, difficult [or] doubtful as to make the issues ripe for litigation," *Walmer*, 52 F.3d at 854, I conclude Altira has failed to establish a likelihood of success on the merits of its reverse confusion claim under the Lanham Act. While this alone could end the inquiry under the *Lundgrin* test, I go on, briefly, to address the remaining factors.

### B. *WHETHER ALTIRA WILL SUFFER IRREPARABLE INJURY UNLESS THE INJUNCTION ISSUES*

■ Altira Group argues that if a preliminary injunction is not entered, Philip Morris will adopt the ALTRIA name, spend hundreds of millions of dollars advertising it, and flood the entire consumer market with associations between ALTRIA and Philip Morris big tobacco. As a result, before the trial on the merits, Altira Group will lose its ability to distinguish its investment services, and moreover, Altira Group will be forever associated with the strong negative taint of tobacco and cigarettes. To support this proposition, Altira Group indicates that Philip Morris's own research shows that 30–40% of consumers are "unalterably opposed" to tobacco companies.

Philip Morris counters that only "wealthy, sophisticated investors with an appetite for risk" will be affected by any name change, and cites the dearth of evidence that such investors would experience or respond to the "negative taint" of tobacco or otherwise act differently as the result of any "subliminal association" with Philip Morris. Philip Morris points to its subsidiaries, including MAXWELL HOUSE, KRAFT, OSCAR MAYER, JELLO, OREO, NABISCO, and MILLER LITE,

as examples of companies that have not been affected by their association with Philip Morris. Moreover, Philip Morris warrants Philip Morris Capital will not conduct its business under the ALTRIA name.

While I find myself sympathetic, in theory, to Altira's claim that it will suffer harm if Philip Morris is allowed to change its name to ALTRIA pending trial, the fact of such harm, by itself, cannot form the basis for preliminary injunctive relief. At this stage of the proceedings, where no serious or substantial question has been raised that such a name change would be anything other than lawful, it simply cannot be enjoined. A preliminary injunction is an "extraordinary" remedy where a party is granted a form of relief before it has proven the behavior to be enjoined is unlawful. Should Altira ultimately be able to prove its claim of reverse confusion, moreover, Philip Morris can be ordered to retract the changed name. Through the same personal contact that characterizes Altira's business practices now, any harmful associations with Philip Morris and tobacco could be dispelled and any loss of business as the result of the associations could conceivably be proven and compensated.

### C. WHETHER THE BALANCE OF HARM FAVORS ALTIRA OR PHILIP MORRIS

██ Philip Morris has already spent more than $1,000,000 in connection with the proposed name change. It has not quantified the damage a preliminary injunction would cause, but asserts delay will increase its costs. It maintains it has 730,-000 shareholders who will benefit "by changing the perception of Philip Morris Companies as primarily a tobacco company with some other businesses, to that of Altria Group, a diversified consumer products manufacturer and marketer in such fields as food, tobacco and beverages."

As for Altira Group, its fears of being painted with the same brush by those who object to Philip Morris's involvement with tobacco may be valid, but at this point, such fears are not founded in fact.

### D. WHETHER A PRELIMINARY IN-JUNCTION WOULD BE ADVERSE TO THE PUBLIC INTEREST

If the grounds for it were indeed established, I do not think a preliminary injunction would be adverse to the public interest. It is not in the public interest, however, to issue a preliminary injunction when they are not.

The Motion for Preliminary Injunction is **DENIED.**